## STATE v. COLLIER, et al.

No. 74-2893.

Circuit Court, Dade County, Criminal Division.

November 27, 1974.

Richard E. Gerstein, State Attorney, Ira J. Dubitsky, Assistant State Attorney, for the state.

Joel Hirschhorn, Miami, for the defendants.

ALPHONSO C. SEPE, Circuit Judge.

This cause having come on to be heard before me upon defendants' motion to dismiss and incorporated memorandum of law and the court having previously taken testimony relative to the factual matters resulting in defendants' arrests herein, and having carefully examined defendants' motion to dismiss and memorandum of law in support thereof, and the state's memorandum of law in opposition thereto, and further the court having heard argument of counsel for the state and the defendants, the court, for the reasons set forth hereafter, hereby declares Florida Statute 856.021 unconstitutional on its face as written, and as applied to the defendants instanter, and dismisses the informations herein.

### Facts

Sometime after midnight, Sunday, March 31, 1974, as Sgt. G. Zamora, a city of Miami police officer who was working an off-duty job as a security officer at the Miami Jai Alai Fronton, was leaving his place of employment, his attention was attracted by Hector Rodriguez, the head cashier at the fronton. Rodriguez was having difficulty starting his car. Sgt. Zamora went into the partially fenced off parking lot to see if he could assist Rodriguez. Both Sgt. Zamora and Rodriguez noticed a late model white Ford, apparently unoccupied, parked in close proximity to Rodriguez' car.

After several unsuccesful attempts to start Rodriguez' car, Sgt. Zamora and Rodriguez pushed Rodriguez' car to a brightly lit area of the parking lot, which was also the only avenue of ingress and egress, to look under the hood of the vehicle. After looking under the hood, Zamora and Rodriguez discovered that the distributor wires had been removed from their normal position, thus disabling the car. Almost simultaneously with this discovery, the late model white Ford, operated by one person, drove slowly past Zamora and Rodri-

guez. Rodriguez immediately told Zamora, "Let's follow him." Both Rodriguez and Zamora got into Zamora's private vehicle and followed the late model Ford.

Although Sgt. Zamora was in full uniform, he was not driving a police car, as he was both "off-duty" from his police job, and "off-duty" from his "off-duty" employment as a security officer. The white Ford drove out of the parking lot, turned right, drove approximately one block, stopped at the red light traffic signal, eventually drove another block or two and then pulled into the lit parking lot of an open International House of Pancakes restaurant. At no time did the operator of the white Ford violate any city, county or state traffic law. Up to this point there was nothing suspicious about the vehicle itself or its manner of operation, except for the fact it had been parked in the fronton parking lot earlier which both Zamora and Rodriguez said was "unusual" at that time of night.

At the restaurant parking lot, Sgt. Zamora pulled up behind the white Ford and asked the driver to identify himself and explain his presence. The white, male driver of this vehicle, defendant Collier, immediately identified himself as a former police officer and indicated that he had his driver's license and other identification in a Pontiac Firebird that was parked adjacent to the white Ford a few feet away. Collier then told Zamora that if he wanted his identification he could get it out of the glove compartment in the Firebird. Zamora thus retrieved Collier's wallet with his identification and although Collier's name was on the identification, Zamora continued to press Collier for an explanation of what he had been doing in the fronton parking lot and how he had gotten there and why he had a second car at the restaurant. Dissatisfied with Collier's "confusing" responses, Zamora searched, without warning or consent, Collier's person, finding a leather holster with a knife and an unloaded hand weapon in Collier's waistband. Zamora immediately arrested Collier for the felony of carrying a concealed firearm. At no time prior to his arrest, did Zamora advise Collier of his *Miranda* rights.

While this was going on Sgt. Zamora told Rodriguez to "check out" the white Ford. Rodriguez, after looking in the car, reported, in Spanish, to Zamora that there was a man wedged on the floor of the back seat of the white Ford. Whereupon Zamora told Collier to lie down on the ground and told Rodriguez to hold a gun on Collier while Zamora opened the door of the Ford and got the other male out of the vehicle. This second person, defendant Deskins, gave the appearance of being a black male. Sgt. Zamora told Deskins to lie on the ground and instructed Rodriguez to call for assistance, which was done. A search of Deskins revealed an unloaded police revolver.

Within moments numerous city of Miami police officers decended upon the restaurant parking lot — even though the restaurant was located in unincorporated Dade County. An on the scene radio and computer check of the license plates of the white Ford and the Pontiac Firebird revealed that although the latter vehicle was registered to defendant Collier, the white Ford's license plate number did not match the description of the vehicle to which it had been issued. A subsequent records check by radio revealed that the white Ford owned by Hertz Rent-A-Car had been reported stolen some six weeks before.

The defendants were transported to the city of Miami police department where the apparent black male was discovered to be a white male, defendant Deskins, who was then a sergeant in the city of Miami police department. After several hours of questioning, during which time both defendants were finally advised of their *Miranda* rights, Deskins and Collier offered essentially the same explanation for their presence at the scene. A methodical warrantless search of both immobilized vehicles revealed certain items such as gloves, a small number of bullets, and a police radio which are not here germane.

Approximately seven hours after their initial arrest, both defendants were charged, for the first time, with loitering and prowling, contrary to Florida Statute 856.021. In addition, both defendants were charged with possession of a stolen vehicle and with buying, receiving and concealing stolen property. Collier was also charged with carrying a concealed weapon.

*Memorandum decision*

No matter how suspicious the defendants' conduct may have been, no matter what contraband may have been seized of or from the defendants, no matter what alleged illegal or improper activity the defendants may have been engaged in, the law is well settled that in the absence of probable cause even an otherwise legal arrest pursuant to a constitutional law is invalid, Bailey v. State, 295 So. 2d 133 (4th DCA 1974); Johnson v. U.S., 333 U.S. 10 (1947). Similarly, if the intial arrest is invalid, or the law upon which the arrest is based is unconstitutional everything subsequent thereto is vitiated, Wong Sun v. United States, 371 U.S. 471 (1963) and its progeny; *Bailey,* supra; and 29 Fla. Jur., *Searches and seizures,* §19. That is the situation *sub judice.* Unless the defendants' arrests under Florida Statute 856.021 can be sustained, all charges placed against the defendants flowing from that arrest must, as a matter of due process of law, fall.

The court observes that the constitutionality of Florida Statute 856.021 is presently pending before the Florida Supreme Court in the cases of Bell v. State, Fla. S.Ct. Case No. 44,586; Worth v.

State, Fla. S.Ct. Case No. 44,587, and State v. Echer, Fla. S.Ct. Case No. 44,348 (hereinafter collectively referred to as *Bell*). This court, reluctant to declare a state statute unconstitutional, has withheld the rendition of the within opinion since it was originally argued in hopes that the Florida Supreme Court would grant some guidance in its decision in Bell. To date no decision has been rendered by the Florida Supreme Court. Thus, this court, ever mindful of the need and concern for prompt judicial disposition of pending criminal cases, will seek to briefly set forth its reasons for declaring Florida Statute 856.021 unconstittuional as written, and as applied. [1]

Florida Statute 856.021 (1972) provides —

(1) It is unlawful for any person to loiter or prowl in a place, at a time or in a manner not usual for law-abiding individuals, under circumstances that warrant a justifiable and reasonable alarm or immediate concern for the safety of persons or property in the vicinity.

(2) Among the circumstances which may be considered in determining whether such alarm or immediate concern is warranted is the fact that the person takes flight upon appearance of a law enforcement officer, refuses to identify himself, or manifestly endeavors to conceal himself or manifestly endeavors to conceal himself or any object. Unless flight by the person or other circumstances makes it impracticable, a law enforcement officer shall, prior to any arrest for an offense under this section, afford the person an opportunity to dispel any alarm or immediate conconcern which would otherwise be warranted by requesting him to identify himself and explain his presence and conduct. No person shall be convicted of an offense under this section if the law enforcement officer did not comply with this procedure or if it appears at trial that the explanation given by the person is true and, if believed by the officer at the time, would have dispelled the alarm or immediate concern.

As noted above, see footnote 1, the court finds that Florida Statute 856.021 is, on its face, vague and indefinite. As the United States Supreme Court held in Connally v. General Construction Co., 269 U.S. 385, 391 (1925) —

. . . the terms of a penal statute creating a new offense must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties . . .

---

1. The court recognizes that some, but not all, of the matters set forth in this opinion will be controlled ultimately by the Florida Supreme Court's decision in *Bell* and thus this court will not elucidate on those issues presented to that court in *Bell*.

The statute before this court, by its very language, requires men of common intelligence to necessarily guess at its meaning and application. Moreover, no two policemen could ever agree on the meaning and application of §856.021. Legislation which is ambiguous, imprecise, and vague ". . . does not provide for government by clearly defined laws, but rather for government by the moment-to-moment opinions of a policeman on his beat," Shuttlesworth v. City of Birmingham, 282 U.S. 87, 90 (1965).

The Florida Supreme Court, in State v. Buchanan, 191 So.2d 33 (1966), has reached the same result, at pages 34 and 36 —

> . . . A statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily question its meaning and differ as to its application violates the first essential of due process of law.
>
> * * *
>
> . . . in its application to penal and criminal statutes the due process requirement of definiteness is of especial importance. If such statutes in defining criminal offenses omit certain necessary and essential provisions which serve to impress the acts committed as being wrongful and criminal, the courts are not at liberty to supply the deficiencies or to undertake to make the statutes definite and certain.

The state contends that §856.021 has certain "built-in" limitations which save it from attack on vagueness grounds. These are delineated in the following portion of the statute with italics —

> (1) It is unlawful for any person to loiter or prowl in a *place,* at a *time* or in a *manner not usual* for law-abiding individuals, under circumstances that warrant a *justifiable* and *reasonable alarm* or *immediate concern* for the safety of persons or property *in the vicinity.*

These so-called "limitations" not only fail to provide sufficient definiteness to redeem the statute from the void for vagueness infirmity, but they are made up of a series of clauses which are each vague in themselves, and when piled one on the other, add further vagueness and uncertainty to the statute. The place, time and manner clauses raise the most obvious questions of exactly what is "usual" for law-abiding individuals and by whose standards these "usual" places, times and manners are to be judged. [2]

---

2. For example, one police officer in deep south Dade County may well have a totally different belief as to what circumstances warrant a justifiable and reasonable alarm for the safety of persons or property, than would a police officer whose beat includes the central Miami area.

Clearly, what is usual for a law-abiding pastor may not be usual for a law-abiding black youth in the ghetto during his jobless summer.

As has been succinctly stated in 49 Journal Urban Law, 767,769, *Field Interrogations: Court Rule and Police Response* (1971-1972) —

> One of the factors leading to the characterization of field interrogation as an oppressive device is that police perceptions of suspicious behaviour are markedly different from those of the lay observer. What may appear to community members to be perfectly normal behaviour, such as congregating on street corners for amusement or wearing highly individualistic clothing or hairstyles, often has the effect of arousing the patrolman's suspicions. The underlying principle of these police judgments is that anything out of the ordinary is suspicious.

The Fourteenth Amendment cannot permit these differences to exist in a criminal statute.

Closely related to the vagueness defect is the spector of overbreadth. The statute by its very vague language has the effect of rendering an otherwise innocent act, criminal. As held in State v. Penley, 276 So.2d 180,181 (2nd DCA 1973), where a law draws no distinction between essentially innocent conduct and that calculated to do harm, and as a result, arbitrary and erratic arrests and convictions result, that law cannot pass constitutional muster. As the Florida Supreme Court stated in Headley v. Selkowitz, 171 So.2d 363,370 (1965), in striking down the old City of Miami Vagrancy Ordinance on grounds of overbreadth —

> Such statutes and ordinances should be applied cautiously and sparingly and only in the most obvious and aggravated cases. Persons should not be charged with vagrancy unless it is clear they are vagrants of their own volition and choice. Innocent victims of misfortune ostensibly appearing to be vagrants but who are not such either by choice or intentional conduct should not be charged with vagrancy.

The Fourteenth Amendment serves as a bar to the all encompassing statute which seeks to act as a net to ensnare otherwise innocent behaviour and render it criminal.

Florida Statute 856.021 is clearly contrary to one's Fourth, Fifth and Sixth Amendment rights. The Fourth Amendment to the United States Constitution provides in pertinent part that ". . . the right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures shall not be violated . . ." The Florida Constitution, Article I, §12, provides in pertinent part, "the right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures . . . shall not be violated." The statute *sub judice* permits a

police officer to search the person of an individual based upon mere suspicion.

The only way to avoid an arrest is for the suspect to satisfactorily explain his presence and conduct. The failure to give what the interrogating police officer believes to be an adequate explanation, or the refusal to give any explanation whatsoever, results in an immediate arrest of the suspect and a search of his person. Thus, only by waiving one's Fifth Amendment privilege against self-incrimination and the right to remain silent can one seek to avoid arrest.

Significantly, the legislature in its infinite wisdom sought apparently to ameliorate the impact of the waiver of the Fifth Amendment privilege by asserting that —

> . . . . no person shall be convicted of an offense under this section [856.021, subsection (2)] if the law enforcement officer did not comply with this procedure or if it appears at the trial that the explanation given by the person is true and if believed by the officer at the time would have dispelled the alarm or immediate concern.

Since the statute compels a person suspected of loitering to identify himself and satisfactorily explain his conduct, the statute completely vitiates the suspect's right against self-incrimination and right to counsel.

Further, the failure of the suspect to identify himself is actually made an element of the crime —

> Among the circumstances which may be considered in determining whether alarm or immediate concern is warranted is the fact that the person . . . refuses to identify himself . . . [856.021 (2)]

Of course, any statements made by a suspect, or the suspect's refusal to identify himself, *prior* to arrest, elicited by the police officer and made by the suspect in an attempt to avoid an arrest would be admitted into evidence against the defendant despite Miranda v. Arizona, 384 U.S. 436 (1966), because that is the very gravamen of the charge. Thus the legislature has very neatly sought to repeal the Fifth Amendment to the United States Constitution. Any statute which infers guilt from the accused's failure to explain his presence or conduct, either upon arrest or at trial, violates the Fifth Amendment. Cf. U.S. v. Cameron, 460 F.2d 1394 (5th Cir. 1972).

Thus, the suspect's Fifth Amendment right to refuse to answer any questions is "chilled" because his failure to answer results in immediate arrest. At trial the defendant must give up his right to remain silent in order to establish the "truth" of his explanation or to explain his failure to respond to the police officer's questions. The burden of proving a defendant's guilt remains exclusively with the state — a defendant has no burden whatsoever to establish his "innocence" under our system of criminal justice.

The state argues, "in any situation an individual may provide an explanation to the police officer after receiving appropriate warnings," — from the state's memorandum in opposition to defendants' motion to dismiss, at page 6. That is precisely the problem. The suspect's failure to provide an explanation either with or without "appropriate warning" results in his arrest; the suspect's failure to provide an "adequate" explanation results in his arrest; and, whatever he says or doesn't say, must be admitted into evidence at his trial or else there can be no determination of his guilt, regardless of whether or not the *Miranda* admonition was given. See also Escobedo v. Illinois, 378 U.S. 478 (1964).

Finally, the statute is unconstitutional because, as written, it is an abuse of the delegation of the legislative power. In Knight and Wall Co. v. Bryant, 178 So.2d 5 (1965), the Florida Supreme Court set out the guidelines for the determination as to whether or not a particular statute is an unconstitutional delegation of legislative authority. *Knight and Wall Co.* held at page 7 —

> . . . that, "the legislature may not delegate the power to enact a law or . . . to exercise an unrestricted discretion in applying a law . . ."

See also State v. Holden, 299 So.2d 8 (1974).

Here the legislature has done precisely that. First the statute, in essence, directs the court trying the case to grant a judgment of acquittal if the police officer fails to comply with what this court terms to be an unconstitutional procedure, or if it appears at trial that the explanation given by the person is true and if believed by the officer at the time would have dispelled the alarm or immediate concern —

1) A finder of fact can never determine whether an explanation is "true" unless the defendant comes forward with affirmative evidence, which he has no burden to do.

2) What if the explanation, although "true", is not believed by the officer either prior to arrest or at trial?

3) How does the finder of fact determine whether the explanation should have been "believed by the officer at the time"?

4) How can the finder of fact determine the "belief" that was in the police officer's mind at the time of the arrest and whether or not that belief was justified if, in fact, the police officer at the time of the arrest did not believe that the suspect's explanation was "true"? For example, a police officer could testify in court, "I don't care how 'true' the defendants expla-

nation is, I didn't believe it at the time, it caused me alarm and concern."

For the above and foregoing reasons, the statute, as written, is clearly repugnant to the Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution Moreover, the statute, as applied to these defendants, under these facts, is clearly contrary to the Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution.

It is thereupon ordered and adjudged that — (1) Florida Statute 856.021 is declared unconstitutional in its entirety, both as written and as applied to the defendants herein, and (2) Defendants' motions to dismiss are granted and the informations herein are dismissed.