**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Charles D. CAMERON, Defendant-
Appellant.**

**No. 71-3138.**

United States Court of Appeals,
Fifth Circuit.

June 1, 1972.

United States Code, Section 2113(c),[2] and Count 2[3] alleged a violation of Title 18, United States Code, Section 1510.[4] Upon a verdict of guilty as charged, he was adjudged guilty and concurrent eighteen months confinement sentences were imposed. This appeal is from that judgment and sentence. We reverse and remand the judgment under Count 1 and reverse and render the judgment under Count 2.

Samuel L. Egger, San Antonio, Tex., for defendant-appellant.

Seagal V. Wheatley, U. S. Atty., Henry J. Novak, Jr., Asst. U. S. Atty., William S. Sessions, U. S. Atty., San Antonio, Tex., for plaintiff-appellee.

Before GOLDBERG, DYER and SIMPSON, Circuit Judges.

SIMPSON, Circuit Judge:

Charles D. Cameron, a practicing attorney of San Antonio, Texas, was tried before a jury below on his not guilty plea to an indictment in two counts. Count 1[1] charged a violation of Title 18,

## I. THE EVIDENCE

At trial, the evidence introduced and reasonable inferences therefrom, viewed most favorably to the prosecution, Glasser v. United States, 1944, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680, warranted belief by the jury that substantially the following occurred.

At 2:30 P.M., June 1, 1971, three men armed with revolvers robbed a facility of the Brooks Field National Bank at Brooks Air Force Base, San Antonio, Texas, an FDIC insured bank, of about $27,000 in currency. The robbers left the location in a stolen automobile provided them by Willie Turner. Following

1. Count 1 of the indictment charged:
   "On or about June 9, 1971, within the Western District of Texas, defendant CHARLES D. CAMERON had in his possession a thing of value in excess of $100.00, to-wit: $560.00 knowing the same to have been stolen from the Brooks Field National Bank whose deposits were insured by the Federal Deposit Insurance Corporation".

2. Title 18, U.S.C., § 2113(c) provides:
   "Whoever receives, possesses, conceals, stores, barters, sells, or disposes of, any property or money or other thing of value knowing the same to have been taken from a bank, credit union, or a savings and loan association, in violation of subsection (b) of this section shall be subject to the punishment provided by said subsection (b) for the taker".

3. Count 2 of the indictment charged:
   "On or about June 9, 1971, within the Western District of Texas, defendant CHARLES D. CAMERON and Nile Wright, Jr., willfully endeavored by means of a misrepresentation to obstruct, delay and prevent the communi-

cation of information relating to a violation of a criminal statute of the United States to a Special Agent of the Federal Bureau of Investigation in the following manner: said defendant willfully caused to be represented to Special Agent Jerome T. Doherty (sic) of the Federal Bureau of Investigation that the whereabouts of $560.00 of monies taken from the Brooks Field National Bank, San Antonio, Texas, in violation of Title 18, United States Code, Section 2113(a), on June 1, 1971, were unknown to him, the said defendant, when in truth and in fact, as the defendant then and there well knew said representation was false".

4. Title 18, U.S.C., § 1510(a) provides:
   "Whoever willfully endeavors by means of bribery, misrepresentation, intimidation, or force or threats thereof to obstruct, delay, or prevent the communication of information relating to a violation of any criminal statute of the United States by any person to a criminal investigator . . . shall be fined not more than $5,000, or imprisoned not more than five years, or both".

their escape, the robbers gave $2,000 of the stolen money to Turner for furnishing them the get away car.

Willie Turner placed the $2,000 in a paper bag and took it to Larry Washington's house. At Turner's request Washington took possession of the bag for safekeeping and placed it on a closet shelf in his house. The following day Turner went to Washington's house and removed $1,000 of the money. After Turner left Washington returned the bag with the remaining money to the closet. Later that day Washington examined the bag and saw the money.

Turner was arrested by agents of the Federal Bureau of Investigation on Friday, June 4, 1971, and lodged in the Bexar County Jail. The day following Turner's mother, Mrs. Estella Lilly, visited her son at the jail. While there Mrs. Lilly met her son's friend, Richard Dukes, who told her he knew of a lawyer who might represent her son, a Mr. Cameron. Mrs. Lilly stated that she had no money, whereupon Dukes told her that he thought Washington had some money she could use for a retainer fee. Mrs. Lilly and Dukes then proceeded to Washington's house.

When Mrs. Lilly and Dukes reached Washington's house, Washington got the bag of money, which had remained in the closet at his house since Wednesday, and gave it to Dukes, who withdrew some bills which he put in his pocket. Dukes then gave the bag to Mrs. Lilly. She took the bag home and counted the contents: $590.00 in ten-dollar bills.

The following Monday, June 7, Dukes called Cameron's law office and spoke to Nile Wright, Jr., an associate who was handling Cameron's business while the latter was on vacation. Following this conversation, Wright and an investigator named Ralph Buller left the office and went to meet Dukes.

Wright and Buller met Dukes, who was with Mrs. Lilly, and the four sat in Wright's car and talked. Dukes said that Mrs. Lilly needed the appellant to represent her son. Mrs. Lilly told Wright that an F.B.I. agent had called her earlier and had told her that the money Washington gave her came from the bank robbery. She also related that the agent asked her to bring the money to his office the next day. Wright told Mrs. Lilly to wait until she talked to the appellant before she did anything. The four individuals then drove to Mrs. Lilly's house to get the $590.00. Mrs. Lilly gave the money to Wright, who put it in his pocket. It may be inferred that Mrs. Lilly believed Wright intended to turn the money over to the federal agents whereas Wright took the money as a retainer for Cameron to represent her son Willie Turner.

Wright and Buller left Mrs. Lilly's house and went to Wright's office where he placed a telephone call to the appellant who was at home. Wright related the day's events and was directed by Cameron to come to his house. Wright arrived about 7:00 P.M., again explained the situation, and gave the money to the appellant. Cameron counted the money and said, "This money is probably stolen". He instructed Wright not to say anything because if the money could not be found nothing could be proved. Cameron then put the money in an envelope which he placed in his desk.

Two days later, June 9, 1971, at approximately 11:30 A.M., an Assistance United States Attorney and two agents of the Federal Bureau of Investigation went to Wright's law office and inquired about the money Mrs. Lilly had given to him. Wright was advised that the money had been stolen from the Brooks Field National Bank, that the robbers had given $2,000 of the money to Turner, that Turner had given the money to Washington, that Washington had given some of the money to Mrs. Lilly, and that Mrs. Lilly had given the money to Wright. Wright was told that he was the only thing standing between the F.B.I. and the money. Advising them that he would call them in one hour, Wright asked the federal agents to leave.

As soon as the agents left his office, Wright called the appellant and told him

exactly what the Assistant United States Attorney had said. The appellant told Wright to say nothing, inferentially on the theory that if the federal agents didn't have the bills themselves, with the serial numbers on them, it would be impossible to identify them as part of the bank robbery proceeds. In apparent compliance with Cameron's advice Wright did not call the F.B.I. Special Agents back within an hour. At 4:00 that afternoon F.B.I. Special Agent Dougherty telephoned Wright inquiring about the money. Wright told Dougherty that he did not have the money and that he did not know where it was.

Cameron was arrested on June 30, 1971, by special agents of the F.B.I. At the time of the arrest, one agent asked Cameron if he knew anything about $560.00 or $590.00 in bills which had been stolen from the Brooks Field National Bank. The appellant replied, "Are these the monies which are supposed to have been received from Estella Lilly?" The agent replied affirmatively and the appellant stated, "I don't know anything about it".

## II. THE CONVICTION UNDER COUNT 1

Over the objection of appellant's counsel, the district judge charged the jury, in part, as follows:

"Now, there was some evidence here that money taken from the Brooks Field National Bank had been recently stolen. Possession of property recently stolen if not satisfactorily explained is ordinarily a circumstance from which the jury may reasonably draw the inference and find in the light of surrounding circumstances shown by the evidence in the case that the person in possession knew that the property had been stolen. Ordinarily the same inferences may reasonably be drawn from a false explanation of possession of recently stolen property. The term 'recently' is a relative term and has no fixed meaning. Whether property may be considered as recent-

ly stolen depends upon the nature of the property and all of the facts and circumstances shown by the evidence in the case. The longer the period of time since the theft, the more doubtful becomes the inference which may be reasonably drawn from unexplained possession.

"Of course, there is no evidence in this case, and the government does not contend, that Mr. Cameron stole any money, that he had anything to do with stealing any money from the Brooks Field National Bank. If you find beyond a reasonable doubt from the evidence in the case that the money described in the indictment was stolen and that while recently stolen the property was in the possession of the accused, you may, from those facts, draw the inference that the money was possessed by the accused with knowledge that it had been stolen, unless possession of the recently stolen property by the accused is explained to the satisfaction of the jury by other facts and circumstances in the case. In considering whether possession of recently stolen property has been satisfactorily explained, you are reminded that in the exercise of Constitutional rights the accused need not take the witness stand and testify. There may be opportunities to explain possession by showing other facts and circumstances independent of the testimony of a defendant.

"You will always bear in mind, ladies and gentlemen, that the law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence. It is the exclusive province of the jury to determine whether the facts and circumstances shown by the evidence in the case warrant any inference which the law permits you to draw from possession of recently stolen property. I don't tell you that you have to draw an inference. I simply say that you may do it if you wish to do it. In the final analysis, whether you draw an inference or whether you

don't draw an inference is exclusively within your province.

"If any possession the accused may have had of recently stolen property is consistent with innocence or if you entertain a reasonable doubt as to the guilt of the defendant, you must acquit the accused. I am not suggesting to you that the defendant had possession of the money. This is also for you to find, but I give you the law for you to use as a guide in making a determination in your own mind as to the guilt or innocence of the defendant under the law."

In the district court, counsel for the appellant argued with persistence and vigor that the above instruction infringed his client's Fifth Amendment privilege against self-incrimination. Cameron elected not to testify during the trial. Here the appellant presents a similar Fifth Amendment argument pertaining to the instruction. The United States counters by referring us to three of our decisions dealing with prosecutions under the Dyer Act, Title 18, U.S.C. Section 2311 et seq.: Hale v. United States, 5 Cir. 1969, 410 F.2d 147, cert. denied 1970, 396 U.S. 902, 90 S.Ct. 216, 24 L. Ed.2d 179; Welch v. United States, 5 Cir. 1967, 386 F.2d 189, and Broom v. United States, 5 Cir. 1965, 342 F.2d 419.

Unlike Section 2113(c), the Dyer Act [5] does not proscribe the "possession" of a stolen motor vehicle or aircraft. The accused in *Hale*, supra, was charged with the interstate transportation of a stolen vehicle; in *Welch*, supra, the accused was alleged to have received and sold a stolen motor vehicle; and in *Broom*, supra, the accused was charged with the sale of a stolen automobile. In each of these three cases, we held that the trial court did not err in instructing the jury as to the inference which it could draw from the unexplained possession of recently stolen property.

In the case *sub judice*, however, the appellant was charged with the knowing *possession* of currency stolen from a federally-insured bank. The United States was required to prove, beyond a reasonable doubt, that the appellant possessed the bills in question and that he knew that the bills were stolen when he had them in his possession. We believe that the delivery of the "unexplained possession of recently stolen property" charge to the jury in this case prejudiced the substantial rights of the appellant in two respects: (1) it permitted the jury to infer the fact of knowledge, one element of the offense, from the fact of possession, the other element of the offense; and (2) it improperly infringed the appellant's privilege against compulsory self-incrimination under the Fifth Amendment to the United States Constitution.

With regard to the first point, the "unexplained possession" charge clearly had the effect, whether intended or not, of enabling the United States to pyramid the requisite element "knowledge" on top of the requisite element of "possession" without the necessity of the prosecution's coming forward with a single additional evidentiary fact bearing on the appellant's knowledge of the stolen character of the money. We have heretofore approved the use of such an instruction only where the defendant has been charged with an offense *other* than the *possession* of stolen property, such as the receipt, transportation, concealment, or sale of the item or items in-

---

5. Title 18, U.S.C., Section 2312 provides:
   "Whoever transports in interstate or foreign commerce a motor vehicle or aircraft, knowing the same to have been stolen, shall be fined not more than $5,000 or imprisoned not more than five years, or both."
Title 18, U.S.C., Section 2313 provides:

"Whoever receives, conceals, stores, barters, sells, or disposes of any motor vehicle or aircraft, moving as, or which is a part of, or which constitutes interstate or foreign commerce, knowing the same to have been stolen, shall be fined not more than $5,000 or imprisoned not more than five years, or both."

volved. Phrased simply, we are unwilling to approve the delivery of such an advice to the jury where, as in this case, the accused is alleged to have violated the law by "possessing" stolen property, such as currency. Upon retrial the jury may be told that the two elements of the offense are possession and knowledge, but not that one may be inferred from the other.

■ Our second basis of reversal as to Count 1, having to do with the appellant's Fifth Amendment privilege against compelled self-incrimination, is closely related to the first basis just explicated. Our Dyer Act and other decisions approving the use of the "unexplained possession" instruction have implicitly recognized the tension between the language of the instruction and the accused's privilege not to testify at his own trial. We have resolved this tension by emphasizing the difficulty in proving the essential element of "knowledge" in most cases involving stolen goods and by pointing out that possession of recently stolen property was susceptible of explanation by means other than the trial testimony of the defendant. The delivery of the "unexplained possession" instruction in this case, however, went too far towards circumscribing the appellant's constitutionally protected privilege to remain silent during his trial. The appellant having been charged with the offense of *possession*, it is altogether possible that when the jury heard the "unexplained possession" charge, it concluded that the appellant was under a legal obligation to come forward with an explanation of his possession of the bills and that this obligation could be satisfied only through the trial testimony of the appellant. We do not believe that the last two sentences of the second paragraph of the instruction, discussing the accused's constitutional

right not to testify, effectively cured the instruction of this fundamental deficiency.

We conclude that the "unexplained possession" instruction, in the context of this case, substantially prejudiced the appellant's rights, and accordingly we set aside the judgment of conviction under Count 1 of the indictment and remand that accusation to the district court for a new trial. [6]

### III.   THE CONVICTION UNDER COUNT 2

Our examination of Title 18, United States Code, Section 1510, and its legislative history persuade us that Count 2 of the indictment does not allege an offense under that statute.

Section 1510 was enacted as part of Public Law 90–123, 81 Stat. 362, November 3, 1967. House Report No. 658, dated September 21, 1967, set forth the purpose of the measure:

"Sections 1503 and 1505 of chapter 73, title 18, presently prohibit attempts to influence, intimidate, impede, or injure a witness or juror in a judicial proceeding, a proceeding before a Federal agency, or an inquiry or investigation by either House of the Congress or a congressional committee. However, attempts to obstruct a criminal investigation or inquiry before a proceeding has been initiated are not within the proscription of those sections. The proposed legislation would remedy that deficiency by providing penalties for attempting to obstruct the communication to a Federal penal law, thus extending to informants and potential witnesses the protections now afforded witnesses and jurors in judicial, administrative, and congressional proceedings." 1967

---

6. Inasmuch as we reverse for a new trial as to Count 1 and the evidence may differ upon retrial, we pretermit discussion of the appellant's other main ground of

attack upon his conviction under Count 1: the insufficiency of the evidence to support conviction.

U.S. Code Congressional and Administrative News p. 1760.

The House Report further explained:

"The real need for this legislation is in the difficulty encountered in the presentation of a case for trial in the field of organized crime and racketeering. It is in these fields that witnesses consistently refuse to cooperate with the prosecution because of threats or other kinds of intimidations directed at them or their families. The ability of organized crime to impose silence on its members and thereby protect both the leaders and the membership of this criminal organization is the primary source of its power and affluence. This strangulation by silence of evidence against the organization has been demonstrated in many cases where potential informants or witnesses have been beaten or tortured or otherwise silenced. There have been instances, according to the Attorney General, where this fear has actually prevented the initiation of proceedings of the matters under investigation. This frustration of criminal investigations and prosecutions should no longer be tolerated, but since there is no statute which presently protects witnesses during the investigative stage, there is need for the enactment of this legislation."

1967 U.S. Code Congressional and Administrative News, p. 1760, at pages 1761–1762.

■ This Report makes clear that Section 1510 was designed to deter the coercion of potential witnesses by the subjects of federal criminal investigations prior to the initiation of judicial proceedings. The statute was just as clearly not intended to deal with communications between alleged accomplices to the commission of federal offenses.

■ Count 2 of the indictment in this case charged that the appellant *and Wright* "willfully endeavored, by means of a misrepresentation to obstruct . . . ." That allegation in our judgment fatally flawed Count 2, requiring that the conviction thereunder be set aside and the count dismissed.

■ We think so because Section 1510 (Note 3, supra) as written deals with the activities of at least three separate individuals or classes of individuals.

For clarity of exposition, we enumerate them in a different order from that followed in the statute. The three are:

A, a criminal investigator (i. e. the F.B.I. special agent here) who is conducting an investigation of the violation of a criminal statute of the United States (as here, Title 18, U.S.C., Sec. 2113, the bank robbery statute);

B, the person who has information as to the offense which some third party endeavors to prevent communication of to A, and

C, the party denounced by the statute who willfully endeavors by means of bribery, misrepresentation (the only means charged in this case), intimidation, or force or threat thereof to obstruct, delay, or prevent communication of the information by B to A. The appellant of course falls under C.

In the present indictment, Wright is charged to have been the accomplice of Cameron,[7] and therefore must fall under C, above, along with Cameron. But there is no one involved who can be B (in our diagram, supra) except Wright, the claimed recipient of Cameron's admonition to say nothing about the mon-

---

7. That Wright was cast in this position in the scheme was recognized by the trial judge when he gave an instruction telling the jury that Wright's testimony was that of an accomplice and was to "be closely examined, received with caution, and weighed with great care." Of course in the normal criminal trial the "accomplice charge" is given at a *defendant's* request in the hope of weakening the force of the testimony of one who has "turned State's evidence".

ey. In a word, the prosecution charged (and is here on appeal defending) the somewhat startling proposition that Wright *and* Cameron imposed silence on Wright by misrepresentation. Under neither logic nor law could Wright have been his own victim. Put another way, if the United States desired to prosecute Cameron under Section 1510 for directing or advising Wright to say nothing about the currency,[8] it should have left Wright out as an accomplice in that enterprise. This is not to say that other difficulties would not have been present if the charge had simply been that Wright was the victim of Cameron's misrepresentation. Indeed, they would have since the evidence, see Part I of this opinion, was convincingly to the effect that Wright and the appellant operated in close cooperation throughout the events which led up to the indictment against Cameron. There is no hint in the proof of force, threats, intimidation and perhaps none of misrepresentation.

At all events, the conviction under the count as cast may not be permitted to stand. The judgment under Count 2 must be reversed with directions to the trial court to dismiss that charge.

## IV. CONCLUSION

The judgments of conviction are reversed and the cause is remanded to the district court for new trial as to Count 1 and for dismissal of Count 2.

Reversed and remanded.

DYER, Circuit Judge (specially concurring):

I am of the view that the charge in this case did not infringe the appellant's privilege against compulsory self-incrimination under the Fifth Amendment to the United States Constitution. I concur in the reasoning and the conclusions reached in the majority opinion on the other issues presented in this appeal.

---

8. The arguments are also made that this was simply an attorney's time-honored advice to a client to keep silent, and further that in no event was there any misrepresentation. Since we direct that the count be dismissed for other reasons, it is unnecessary to discuss these contentions.