UNITED STATES of America, Plaintiff-Appellee,

v.

**Harry U. SCRUGGS, Sr., and Harry U. Scruggs, Jr., Defendants-Appellants.**

**Nos. 76–1688, 76–1689.**

United States Court of Appeals, Sixth Circuit.

Argued Dec. 9, 1976.

Decided Feb. 22, 1977.

Rehearing and Rehearing En Banc Denied April 18, 1977.

Robert W. Andrews, Erich W. Merrill, Memphis, Tenn., for defendants-appellants.

Thomas F. Turley, Jr., U. S. Atty., Glen Reid, Jr., Memphis, Tenn., for plaintiff-appellee.

Before PHILLIPS, Chief Judge, and WEICK and PECK, Circuit Judges.

PHILLIPS, Chief Judge.

Harry U. Scruggs, Sr., and Harry U. Scruggs, Jr., father and son attorneys practicing together in Memphis, Tennessee, were charged in a three count indictment as follows: (1) Count I charged both defendants with knowingly possessing, concealing and disposing of money that had been stolen from a federally insured bank in violation of 18 U.S.C. §§ 2 and 2113(c); [1] (2) Count II charged both defendants with wilfully endeavoring to obstruct, delay and prevent the communication of information by each other, and others, to criminal investigators regarding violations of 18 U.S.C. § 2113(c), in violation of 18 U.S.C. §§ 2 and 1510; [2] and (3) Count III charged Scruggs,

1. 18 U.S.C. § 2113(c) provides:

(c) Whoever receives, possesses, conceals, stores, barters, sells, or disposes of, any property or money or other thing of value knowing the same to have been taken from a bank, or a savings and loan association, in violation of subsection (b) of this section shall be subject to the punishment provided by said subsection (b) for the taker.

2. 18 U.S.C. § 1510 provides in part:

1510. Obstruction of criminal investigations.—(a) Whoever willfully endeavors by means of bribery, misrepresentation, intimidation, or force or threats thereof to obstruct, delay, or prevent the communication of information relating to a violation of any criminal statute of the United States by any person to a criminal investigator; or

Jr. with comforting and assisting James Douglas Gardner, in order to hinder and prevent his apprehension, with knowledge that Gardner had committed an offense against the United States in violation of 18 U.S.C. § 3.[3]

Scruggs, Jr. and Scruggs, Sr. were tried together to a jury on June 9–13, 1975. The jury found Scruggs, Jr. not guilty of the aiding and comforting charged in Count III of the indictment. Both defendants were found guilty on Counts I and II. Scruggs, Sr. was sentenced to pay a fine of $500 on each count of his conviction. Scruggs, Jr. was sentenced to concurrent terms of one year and one day in the custody of the Attorney General. Both defendants appeal. We affirm.

Three contentions are urged as grounds for reversal of the convictions:

1) That there was insufficient evidence to support the verdicts of the jury;

2) That the district judge committed reversible error in his instructions to the jury regarding Count I of the indictment—the count charging knowing possession, concealment and disposition of stolen money;

3) That 18 U.S.C. § 1510, the statute named in Count II of the indictment, does not provide a proper basis for conviction on the facts presented.

### I.

On July 27, 1973, James Douglas Gardner was arrested and confined in the County Jail for Shelby County, Tennessee, on several charges of armed robbery and related offenses. Gardner made bond of $7,500 on that day and was released. He did not appear in the Shelby County Criminal Court at the appointed time to answer to the armed robbery charges. Gardner's bond, therefore, was revoked and a further indictment issued for bond jumping. On November 19, 1973, Gardner was arrested and returned to the Shelby County Jail (a total of ten indictments were then pending against him) where he remained until January 1974.

On January 27, 1974, the appellants, Harry U. Scruggs, Jr. and Harry U. Scruggs, Sr., Memphis attorneys, contacted Gardner in the Shelby County Jail to make arrangements to represent him on the state charges he faced. The Scruggses testified that they made this contact at the insistence of Gardner's mother who was a hostess at a restaurant they frequented. Gardner told the Scruggses that he wanted them to represent him on all of the state indictments. The Scruggses agreed but set a fee for their services of $10,000 payable in advance. Gardner indicated that he could pay the fee, that he had a helpful relative in Arkansas and a bank account in Florida, but that he could not get the money while he remained in jail. At this time (January, 1974), Scruggs, Jr. was engaged almost full time as an attorney for the Shelby County Public Defenders Office. Scruggs, Jr., on Gardner's behalf, contacted the Director of the Shelby County Pretrial Release Program and, on January 31, 1974, Gardner's original $7,500 bond was reinstated and Gardner was released from jail upon posting a $1.00 additional bond for the bail jumping charge.

Twelve days later, at approximately 2:30 p. m. on February 11, 1974, Gardner and an accomplice robbed the Fox Meadows

---

Whoever injures any person in his person or property on account of the giving by such person or by any other person of any such information to any criminal investigator—
    Shall be fined not more than $5,000, or imprisoned not more than five years, or both.

**3.** 18 U.S.C. § 3 reads in full:
§ 3. Accessory after the fact
    Whoever, knowing that an offense against the United States has been committed, receives, relieves, comforts or assists the offender in order to hinder or prevent his apprehension, trial or punishment, is an accessory after the fact.
    Except as otherwise expressly provided by any Act of Congress, an accessory after the fact shall be imprisoned not more than one-half the maximum term of imprisonment or fined not more than one-half the maximum fine prescribed for the punishment of the principal, or both; or if the principal is punishable by death, the accessory shall be imprisoned not more than ten years.

Branch of the Memphis Bank and Trust Company of some $21,000 in cash.

Later in the afternoon of February 11th, Gardner called the Scruggses at their law office and informed them that he had some money for them. He was told to come in during the early evening and he arrived at their office around 5:30 p. m. carrying a brown briefcase. Gardner was ushered into the Scruggses' law library where in the presence of both attorneys, be counted out $5,000 [4] in cash from the briefcase. As the Scruggses recalled this meeting at trial, with the exception of a single one hundred dollar bill, the entire $5,000 was in small denominations (ones, fives and tens), the money was dirty and wrinkled, and there were many rubber bands in the briefcase.[5] Scruggs, Sr. said that he asked Gardner whether "he was mixed up in anything," and Gardner assured him that he was not and that the money was "clean money." At trial Gardner told the court that the money he delivered to the Scruggses on February 11, 1974, was part of the proceeds of the bank robbery earlier that day, but he did not tell the Scruggses this on the 11th of February.

After counting the money, Scruggs, Jr. wrote Gardner a receipt from one of the standard receipt books maintained by the Scruggses in their law practice. Scruggs, Jr. told the jury that he and his father were

in a hurry that evening and out of carelessness he made out the receipt to Gardner for $6,000 rather than for the $5,000 amount they actually received. Gardner left the Scruggses' office with the $6,000 receipt and Scruggs, Jr. testified that he put the cash into a brown file folder and locked it in his desk drawer.

Gardner returned to the Scruggses' office the next day, February 12, 1974. Scruggs, Sr. met with Gardner alone on this occasion and Gardner gave him a bundle of ten one hundred dollar bills in further payment of the $10,000 fee. Scruggs, Sr. gave Gardner a second receipt.[6]

On Friday morning, February 15, 1974, Scruggs, Sr. appeared in Shelby County Criminal Court with Gardner to get a continuance of the pending matters.[7] Around noon on the 15th, Gardner met with Scruggs, Jr. and an employee of the Scruggses, a Mr. Peters, at the Scruggses' office. According to Scruggs, Jr., Gardner complained about having trouble with his mother and about wanting to move out of his mother's home into an apartment. As a favor to Gardner, Scruggs, Jr. gave Gardner a note with the address of Mr. Peters' apartment on it and told Gardner that he could go there and stay.[8] As Gardner was leaving the Scruggses' office, Scruggs, Sr. approached and asked him to return the receipts they had given him on February

---

4. This $5,000 figure is the amount the appellants testified to receiving on February 11. Gardner testified that he in fact gave them $6,000 on this first occasion. Although it is appropriate on appeal for this court to review all the evidence and inferences therefrom in the light most favorable to the government (*United States v. Wolfenbarger*, 426 F.2d 992, 995 (6th Cir. 1970)), here, and where indicated elsewhere in this opinion, we present the facts as they were related at trial by the appellants. We do this to demonstrate the substantial extent to which the elements of the crimes charged were established at trial by the appellants' own testimony.

5. Gardner testified that the money was in bundles each bound with a "Memphis Bank & Trust Company" wrapper.

6. Gardner claimed that he gave Scruggs, Sr. $3,000 on February 12 and that $1,000 was in

new, consecutively numbered one hundred dollar bills.

7. In the Shelby County Criminal Counts, continuances are routinely granted at the request of retained attorneys because they are not required to "sign the jackets" for a defendant's case until their fee has been paid.

8. According to Gardner, the Scruggses confronted him at this meeting on February 15 and he confessed to them to having committed the bank robbery on February 11. Gardner claimed at trial that Scruggs, Jr., gave him Mr. Peters' address so that he could hide from the police for a few days and come up with the rest of the $10,000 fee. The jury acquitted Scruggs, Jr. of the charges that he had aided and comforted Gardner in an effort to hinder and prevent his apprehension.

11th and 12th. Scruggs, Sr. testified that he asked for the receipts back because he and his son had recounted the money and found that they had not received from Gardner the amounts indicated on the receipts. Gardner gave Scruggs, Sr. the two receipts.

Scruggs, Jr. testified that later in the afternoon of February 15, 1974, around 4:20 p. m., he received a telephone call at his office with some information concerning Gardner. Based on this information, Scruggs, Jr. and Mr. Peters set about trying to locate Gardner. Scruggs, Jr. testified that he went to the Memphis City jail but found no record that Gardner had been there. He called a friend of his on the robbery squad of the Memphis Police Department and asked if a James Gardner had been involved in any robbery. Finding nothing, he called the Shelby County Jail but, again, no one knew where Gardner was.

Scruggs, Jr. was not able to find Gardner because he was in the custody of the Memphis Office of the Federal Bureau of Investigation. Around four in the afternoon of February 15th, a federal grand jury had returned an indictment against Gardner charging him with the February 11, 1974, robbery of the Fox Meadows Branch of the Memphis Bank & Trust Company. The FBI immediately arrested Gardner at his home and took him to the FBI office for processing.

According to Scruggs, Jr., he received a telephone call at his office around 5:40 p. m. on the 15th. The caller identified himself only as "the F.B.I.," and told Scruggs, Jr. that Mr. James Gardner wanted to talk to him. Gardner came onto the line and told Scruggs, Jr. that he had been arrested. Scruggs, Jr. testified that he advised Gardner not to talk to the F.B.I., but that he was unable to find out why Gardner had been arrested because no one (neither Gardner himself nor the F.B.I. agents) told him any more than that there was an "investigation" underway. Agent Hart of the Memphis Office of the F.B.I. testified that he spoke with Scruggs, Jr. after Gardner

and, in response to Scruggs, Jr.'s questioning, told Scruggs that Gardner had been charged with bank robbery.

On Saturday morning, February 16, 1974, Scruggs, Jr. and Scruggs, Sr. met at their office before going to visit Gardner in the Shelby County Jail. Scruggs, Jr. stated at trial that Scruggs, Sr. had the morning Memphis *Commercial Appeal* with him and that the paper was "spread all over" with accounts of James Gardner's arrest for the robbery of the Memphis Bank & Trust Company on February 11th. The articles detailed the robbery itself and Gardner's subsequent apprehension. The Scruggses have maintained throughout their trial and this appeal that the *Commercial Appeal* articles on the morning of February 16, 1974, were the first information they received indicating Gardner was involved in or accused of a bank robbery.

After reading the paper, the Scruggses went to see Gardner in jail. According to Scruggs, Sr., they confronted Gardner with the newspaper accounts and questioned him about the bank robbery. Gardner told them that the FBI "had the wrong man."

On Tuesday, February 19, 1974, Gardner had an initial hearing on the bank robbery charge before the federal Magistrate. Scruggs, Sr. appeared with Gardner but only to tell the court that he would not be representing Gardner on the federal charge. The Magistrate appointed a local attorney, Bruce Kramer, to represent Gardner.

Bruce Kramer met at length with his new client on February 19 and 20, 1974. Gardner admitted his role in the bank robbery to Kramer and described in detail what took place. When Kramer pressed Gardner about what had become of the proceeds of the robbery, Gardner told Kramer the story of the payments to the Scruggses on February 11th and 12th.

Gardner's account of the payments to the Scruggses deeply disturbed Kramer. Unsure whether to believe Gardner and uncertain about what to do with the information he had concerning the proceeds of the bank robbery, Kramer consulted a senior member of the law firm with whom he was associat-

ed. Based on that discussion, Kramer determined to contact the Scruggses directly.

On February 21, 1974, Kramer spoke with Scruggs, Jr. by telephone. Kramer testified at trial that he told Scruggs, Jr. what Gardner had said about two cash payments to the Scruggses totalling $9,000.[9] According to Kramer, Scruggs, Jr. responded that he had not received any money from Gardner and that "there was nothing to" the story Gardner had told. As Scruggs, Jr. recalled this telephone conversation at trial: ". . . Mr. Kramer did ask if I had received $7,000, and I told him that I had not received $7,000 . . . I had not. I had received only $6,000."

Kramer met again with Gardner and told him that Scruggs, Jr. had denied receiving any money from him. Gardner insisted he was telling the truth and indicated that Jerry Harris, an attorney who had represented Gardner on state charges before the Scruggses took over, could verify the account. Kramer stated at trial that he consulted with Jerry Harris, that Harris was familiar with the story of the payments of bank robbery proceeds by Gardner to the Scruggses, and that after this conversation with Harris, Kramer decided to report the information he had to the F.B.I. Scruggs, Jr. testified that at some point Jerry Harris also confronted him with Gardner's story: ". . . Mr. Harris said this Gardner says that he has paid you $9,000 and I told him [Harris] that was not correct."

On February 22, 1974, the Scruggses met with Gardner and Gardner's mother at the Shelby County Jail. Scruggs, Jr. explained at trial that Gardner repeated his desire to have the Scruggses represent him on the state charges at this meeting. Scruggs, Jr. told the Gardners that he would have to have some assurance that the $10,000 fee would be paid in full. He produced a promissory note for $10,000. Mrs. Gardner signed the note. This note was introduced as an exhibit at the Scruggses' trial. It contains no reference to the cash payments made by Gardner to the Scruggses on February 11th and 12th.

Also on February 22nd, Kramer went to the F.B.I. with the information he had regarding the proceeds of the robbery. Soon after their visit with the Gardners, the Scruggses were met at their office by two F.B.I. agents. The Scruggses agreed to be interviewed by the agents, but insisted on making a tape recording of the session.[10]

The agents testified that both Scruggses denied having any knowledge that Gardner was involved in a bank robbery until reading about it in the *Commercial Appeal* on February 16th. When the agents indicated to the Scruggses that the F.B.I. had information that Gardner had made large cash payments to them just after the robbery on February 11th and again on February 12th, both Scruggses emphatically denied receiving cash from Gardner and they explained to the agents that, just that very morning, the Gardners had secured the payment of their fee by signing a promissory note.

The agents then asked to see the Scruggses' receipt books. Scruggs, Jr. produced a book for the agents containing the carbon copies of all the fee receipts written during the course of his practice for part of 1973 and all of 1974. The agent who inspected the receipt book noticed that there were regular payments recorded up to February 11, 1974. The agent testified that the last receipt on one page was dated February 11, 1974, and the first receipt on the next page was dated February 16, 1974. There were no receipts in the book dated between those two days. Scruggs, Jr. explained the lapse in the book by saying that he did not receive any money between the 11th and 16th of February, 1974. On closer inspection, the agent observed that two

---

9. Gardner told Kramer on February 19, 1974, the same story Gardner maintained at trial—that he gave the Scruggses $6,000 on February 11th and $3,000 on February 12th, for a total of $9,000.

10. The Scruggses were not able to produce the tape recording of this interview with the F.B.I. at trial. Scruggs, Jr. explained that the batteries on the tape recorder must have been weak because he found nothing on the tape after the agents left.

pages of copies of receipts had been torn out of the receipt book in the gap between the 11th and 16th of February, leaving only the ends of the pages where they had been bound into the book. This was called to the Scruggses' attention. Scruggs, Jr. stated at the time that he did not know what had happened to the missing pages but he suggested that an employee might have mistakenly torn them out. At trial Scruggs, Jr. explained that his wife was taking telephone calls at the office on the evening of February 11th and had used some pages of duplicate fee receipts out of the book to take down telephone messages. Neither the pages of duplicate receipts nor the original receipts given to Gardner and then taken back by Scruggs, Sr. were produced at trial.

Scruggs, Jr. testified that on Saturday, February 23, 1974, he took his share of the cash received from Gardner—$3,000 or one-half of the $6,000 the Scruggses say Gardner actually gave them—to his home in a brown manilla folder. After a sleepless night of "wondering what was going on," he called his father who lived next door and asked his father to give him the other half of the cash. The Scruggses met in the yard between their houses and Scruggs, Jr. took Scruggs, Sr.'s half of the cash. Scruggs, Jr. explained that he returned to his house and did as follows: ". . . I took the money and it was chilly that day . . . and I threw the money into the fire place and burned it up every bit of it." When asked at trial why he burned the money, Scruggs, Jr. replied: "I burned it because I did not know where that money came from because Mr. Gardner had told me so many tales that I didn't know really where that money came from."

On Monday, February 25, 1974, Bruce Kramer, Gardner's attorney for the bank robbery charge, met with Scruggs, Sr. at the Scruggses' office. As he had done over the telephone with Scruggs, Jr. on Febru-

ary 21st, Kramer confronted Scruggs, Sr. with Gardner's allegations that the Scruggses had received the cash proceeds of the February 11th bank robbery. Kramer testified that Scruggs, Sr. denied that he had ever received any money from Gardner and insisted that nothing Gardner said could be believed.[11]

Subsequently, the Scruggses requested a meeting with the United States Attorney and on February 28, 1974, both appeared with counsel and gave voluntary statements. The Scruggses admitted that James Gardner had made large cash payments to them in their office on or about the 11th and 12th of February. They admitted giving Gardner receipts for the payments and Scruggs, Sr. told of getting them back from Gardner because they were in error. Scruggs, Jr. admitted that he had denied receiving the payments when he was questioned by Bruce Kramer and Jerry Harris, but he denied that he had torn any pages out of his receipt book. Scruggs, Jr. stated that he no longer had the money he and his father had received from Gardner, because he had burned it in his fireplace at home on February 24th.

The Scruggses were indicted as hereinabove stated on March 12, 1974.

██ It is readily apparent from this review of the evidence that all of the elements of an offense under 18 U.S.C. § 2113(c) were proved by the government beyond a reasonable doubt. The essential elements of a § 2113(c) offense are these: 1) proof that property *or money* or other things of value were taken from a federally insured bank; 2) proof that the defendants possessed, concealed or disposed of said property or money; and 3) proof that the defendants had knowledge of the stolen character of the property or money at the time they possessed, concealed or disposed of it. The Scruggses do not appear to challenge the sufficiency of the evidence as

---

11. Kramer also testified that Scruggs, Sr. insisted on playing a tape recording, for him at this meeting. The tape contained an earlier conversation between the Scruggses and Gardner relating to attorney-client matters having

no apparent bearing on Kramer's responsibility to defend Gardner on the bank robbery charge. Scruggs, Sr. indicated that he wanted Kramer to hear the tape so Kramer would see that Gardner was crazy and could not be believed.

to elements 1 and 2 above. They strenuously contend, however, that the government failed to establish the requisite "knowledge" in element 3.

Proof of knowledge, like proof of intent, is rarely established by direct evidence. It has long been recognized in this circuit and elsewhere that circumstantial evidence—independent facts from which an inference of the ultimate fact to be established may rationally be drawn in light of common experience—can be sufficient to support a jury's determination that a defendant had guilty knowledge beyond a reasonable doubt. *See, e. g., Melson v. United States,* 207 F.2d 558, 559 (4th Cir. 1953); *United States v. Werner,* 160 F.2d 438, 441–42 (2d Cir. 1947); *Kasle v. United States,* 233 F. 878, 886–88 (6th Cir. 1916); *United States v. Zochowski,* 331 F.Supp. 1070, 1072 (S.D.N.Y.1971), *aff'd,* 456 F.2d 1336 (2d Cir. 1972); *In Re Ryder,* 263 F.Supp. 360, 364–65 (E.D.Va.), *aff'd,* 381 F.2d 713 (4th Cir. 1967).

Citing this court's opinion in *Kasle, supra,* 233 F. 878, with approval, Judge Learned Hand had this to say about knowledge of the stolen character of goods in *United States v. Werner, supra,* 160 F.2d at 441–42:

> The defendants ask us to distinguish between "knowing" that goods are stolen and merely being put upon an inquiry which would have led to discovery; but they have misconceived the distinction which the decisions have made. The receivers of stolen goods almost never "know" that they have been stolen, in the sense that they could testify to it in a court room. . . . But that the jury must find that the receiver did more than infer the theft from the circumstances has never been demanded, so far as we know; and to demand more would emasculate the statute, . . ..

Taking the Scruggses' own story at face value, these defendants had the following information when they finally "disposed of" the cash by burning it on February 24, 1974. They knew that their client, James Gardner, had been arrested and charged with the February 11th robbery of the Fox

Meadows Branch of the Memphis Bank and Trust Company. They had seen pictures in the newspaper taken by bank cameras of a person that looked like their client caught in the act of robbing a bank. They knew that less than three hours after their client allegedly robbed a bank, he had appeared at their law office with a briefcase full of cash in small denominations. They knew that their client had told the F.B.I. and two different attorneys, Jerry Harris and Bruce Kramer, that he had paid the Scruggses a large amount of cash out of the proceeds of the alleged bank robbery. The Scruggses knew that they were under suspicion by the F.B.I. in connection with Gardner, the fee payments and the bank robbery proceeds as a result of the interviews and investigation conducted at their offices by the F.B.I. on February 22, 1974.

Can it be said that with all of this information the Scruggses were at no point "put upon an inquiry" in regards to the source of the money they received from Gardner on February 11th and 12th? *Werner, supra,* 160 F.2d at 441. We do not think so. Even if the jury had discounted Gardner's insistence throughout the trial that the Scruggses knew as early as February 15th that they had been paid with the proceeds from a bank robbery, the evidence is overwhelming that the Scruggses had the requisite knowledge of the character of the money they had received during the period they possessed, concealed, and finally, disposed of it.

The Scruggses' contentions concerning the sufficiency of the evidence supporting the convictions on Count II of the indictment (wilfull obstruction of communications to investigators) are dealt with in Part III below.

## II.

Related to their challenge to the sufficiency of the evidence of guilty knowledge, the Scruggses also challenge the charge to the jury by the District Court on the meaning of "knowing" for purposes of 18 U.S.C. § 2113(c).

At the close of all proof, District Judge Robert M. McRae, Jr. reviewed his intended

charge to the jury with counsel and there were no stated objections. The charge was given and the jury retired to deliberate. After some deliberations, the jury returned to the courtroom and the foreman asked for further instructions on the meaning of the word "knowingly" in the indictment. The court re-read part of the original charge, then gave the following new instructions:

I further submit to you that there is no dispute on the fact that Mr. Scruggs, Jr. disposed of at least six thousand dollars by burning it.

Therefore, the issue for you to determine is that if during the time that the money was possessed between the dates in the indictment, and I submit that they knew they possessed, they knowingly possessed it, then you must decide whether, in fact, they knew it was money that was stolen.

If the knowledge came at any time during the possession then they could be found guilty. It does not mean they had to know it was stolen at the time they got it.

Now, at the time it was concealed if you find it was concealed they must have known that it was stolen from the bank.

At the time it was burned up you must decide whether Mr. Scruggs, Jr. knew that, regardless of whether he knew it when he received it. That is the fact that you must determine.

Now, in this process of course you are the ones who are to determine what weight to give to all the evidence.

Now, maybe this is some help to you, and possibly it answers your questions. Do you think it does?

THE FOREMAN: Yes, sir, that's exactly it.

The Scruggses contend on this appeal that they did not know the money they received from Gardner was stolen from a bank at the time they received it. They reason that Gardner gave them the money as consideration for their agreement to represent him in the state courts, and, as a result of their innocence of the source of the funds, they acquired "title" to the mon-

ey when it was given to them. It follows therefore, according to the Scruggses, that the instruction on "knowingly" was in error because it allowed the jury to convict the defendants if the jury found the defendants learned the money was stolen while they possessed it, without having to find that the defendants knew the money was stolen at the time they received it and "acquired title" to it. In support of this argument the Scruggses have cited a large number of state and federal decisions in the commercial and banking contexts holding that innocent parties can acquire "title" to misappropriated funds sufficient to defeat efforts at recovery of the funds by the original victim of the theft.

Whatever the rules regarding "title" may be in the fields of commerce and banking, the appellants would have this court ignore entirely the criminal statutes under which they were charged. 18 U.S.C. § 2113(c) is worded clearly in two ways pertinent to the Scruggses' argument. The statute specifically names "money" as a thing of value covered by the statute which is unlawfully possessed, concealed, etc., if there is knowledge of its stolen character. Additionally, the statute is worded in the disjunctive. It is a federal offense to receive *or* dispose *or* conceal money stolen from a federally insured bank with knowledge, etc. The Tenth Circuit's interpretation of similar language in 18 U.S.C. § 659 is analogous:

We are of the opinion that the offense of possession of stolen goods is distinct from the offense of receiving stolen goods. The statute defines these offenses in the disjunctive and, therefore, clearly reflects the congressional intent that there were to be distinct crimes. This construction is reasonable because in instances similar to the case at bar the long continued possession of goods may well allow circumstances to give rise to knowledge that the property had been stolen even though the original receipt of the goods may have been innocent.

*United States v. Koran,* 453 F.2d 144, 146 (10th Cir. 1972).

Appellants were not indicted for receiving stolen money. They were charged with possession, concealment and disposition. Their own testimony at trial established that they did some or all of these things with the money they received on February 11th and 12th. District Judge McRae correctly instructed the jury that a violation of § 2113(c) was established if at any time during their possession of the money the Scruggses came into knowledge of its stolen character. This is what the statute makes unlawful and this court declines to read the rules of commerce relied upon by appellants into the plain language of these criminal provisions.

### III.

In addition to challenging the sufficiency of the evidence supporting the convictions under 18 U.S.C. § 1510 (Count II of the indictment), the appellants challenged the propriety of prosecution under this section based on the Fifth Circuit's holding in *United States v. Cameron,* 460 F.2d 1394 (5th Cir. 1972).

18 U.S.C. § 1510, reproduced in part in note 2 above, was enacted by Congress in 1967 for the following stated purposes:

### PURPOSE OF THE BILL

The purpose of the proposed legislation is to amend chapter 73, title 18, United States Code (relating to obstruction of the administration of justice), by adding a new section prohibiting the obstruction of Federal criminal investigations.

Sections 1503 and 1505 of chapter 73, title 18, presently prohibit attempts to influence, intimidate, impede, or injure a witness or juror in a judicial proceeding, a proceeding before a Federal agency, or an inquiry or investigation by either House of the Congress or a congressional committee. However, attempts to obstruct a criminal investigation or inquiry before a proceeding has been initiated are not within the proscription of those sections. The proposed legislation would remedy that deficiency by providing penalties for attempting to obstruct the communication to a Federal penal law, thus extending to informants and potential witnesses the protections now afforded witnesses and jurors in judicial, administrative, and congressional proceedings.

H.R.Rep. No. 658, 90th Cong., 1st Sess. (1967), 1967 *U.S.Code Cong. & Ad. News* p. 1760.

In *Cameron,* the Fifth Circuit held that § 1510 was inapplicable because, on the facts of that case, there was no witness, juror or person who, in the words of the court, "has information as to the offense which some third party endeavors to prevent communication of to" a criminal investigator. *Cameron, supra,* 460 F.2d at 1401. In *Cameron* this was true because the indictment charged that the victim of the alleged threats and misrepresentations was an accomplice to the efforts of the defendant to obstruct the criminal investigation therein. The court analyzed the problem this way:

. . . Section 1510 . . . as written deals with the activities of at least three separate individuals or classes of individuals.

For clarity of exposition, we enumerate them in a different order from that followed in the statute. The three are:

A, a criminal investigator (i. e. the F.B.I. special agent here) who is conducting an investigation of the violation of a criminal statute of the United States (as here, Title 18, U.S.C., Sec. 2113, the bank robbery statute);

B, the person who has information as to the offense which some third party endeavors to prevent communication of to A, and

C, the party denounced by the statute who willfully endeavors by means of bribery, misrepresentation (the only means charged in this case), intimidation, or force or threat thereof to obstruct, delay, or prevent communication of the information by B to A. The appellant of course falls under C.

In the present indictment, Wright is charged to have been the accomplice of Cameron, and therefore must fall under C, above, along with Cameron. But there

is no one involved who can be B (in our diagram, supra) except Wright, the claimed recipient of Cameron's admonition to say nothing about the money. In a word, the prosecution charged (and is here on appeal defending) the somewhat startling proposition that Wright *and* Cameron imposed silence on Wright by misrepresentation. Under neither logic nor law could Wright have been his own victim. Put another way, if the United States desired to prosecute Cameron under Section 1510 for directing or advising Wright to say nothing about the currency, it should have left Wright out as an accomplice in that enterprise. . . . (footnotes omitted)

*Cameron, supra,* 460 F.2d at 1401–02.

Count II of the indictment in the instant case charges the Scruggses with wilfully endeavoring to prevent communication of information to criminal investigators "by each other, *and others.*" (Emphasis added.) As the Eighth Circuit found on the facts presented in *United States v. Pecina,* 501 F.2d 536 (8th Cir.), *cert. denied,* 419 U.S. 1072, 95 S.Ct. 660, 42 L.Ed.2d 668 (1974), we find that *Cameron* is of no aid to the appellants in this case because we clearly do have persons to fill the role of "B" in the Fifth Circuit's analysis, quoted above. 460 F.2d at 1401. As demonstrated in the foregoing recitation of the facts, the Scruggses repeatedly misrepresented to Gardner's attorneys, Jerry Harris and Bruce Kramer, that they had not received any cash payments from Gardner. The Scruggses admitted making these misrepresentations in their voluntary statements to the F.B.I. on February 28, 1974. These misrepresentations were made at a time when the F.B.I. was suspicious of the Scruggses and had them under investigation as a result of information from Kramer.[12] The misrepresentations were made before the initiation of judicial proceedings against the Scruggses and thus the facts present a storybook case of the wrongs § 1510 was enacted to combat. The evidence clearly was sufficient to support the jury's verdict that the appellants made misrepresentations in an endeavor to obstruct the efforts of criminal investigators to uncover their own wrongdoing.

The judgments of conviction are in all respects affirmed.

12. It is reemphasized that on February 25, 1974, three days after the extensive interrogation by the F.B.I. of the Scruggses concerning the money from Gardner, Scruggs, Sr. was confronted by Bruce Kramer and denied receiving *any* money from Gardner.