UNITED STATES of America, Appellee,

v.

Leonard S. SIEGEL and Martin B. Abrams, Defendants-Appellants.

Nos. 929, 891, Dockets 82–1366, 82–1369.

United States Court of Appeals, Second Circuit.

Argued Feb. 23, 1983.

Decided Aug. 24, 1983.

partment of State v. Treasure Salvors, Inc., 689 F.2d 1254, 1256 (5th Cir.1982).

Walter P. Loughlin, Asst. U.S. Atty., S.D. N.Y., New York City (John S. Martin, Jr., U.S. Atty., S.D.N.Y., New York City, of counsel), for appellee.

Deborah A. Schwartz, New York City (Newman & Adler, Gustave Newman, New York City, of counsel), for defendant-appellant Siegel.

Michael Ross, New York City (LaRossa, Axenfeld & Mitchell, New York City, of counsel), for defendant-appellant Abrams.

Before PIERCE, WINTER and PRATT, Circuit Judges.

GEORGE C. PRATT, Circuit Judge:

Leonard S. Siegel and Martin B. Abrams appeal from judgments of conviction in the United States District Court for the Southern District of New York, Charles E. Stewart, Jr., *Judge,* entered after a jury trial. Both defendants were found guilty of fifteen counts of wire fraud, in violation of 18 U.S.C. §§ 1343 and 2. Defendant Abrams was found guilty of endeavoring to obstruct federal investigators in violation of 18 U.S.C. §§ 1510 and 2. Although both defendants were convicted of aiding in the preparation of a false corporate tax return in violation of 26 U.S.C. § 7206(2), neither defendant appeals from that conviction.

We find sufficient evidence in the record to support the convictions under the wire fraud statute and affirm on those counts. Because we conclude, however, that Abrams' conduct did not violate 18 U.S.C. § 1510, we reverse his conviction for obstruction of justice.

## FACTS

Abrams and Siegel were tried with three co-defendants, Michael Gold, Frederick Pierce, and Irving Cotler, on a twenty count indictment. Counts one through fifteen charged all five defendants with use of interstate wires in furtherance of a fraudulent scheme to obtain money and to defraud Mego International, Inc. (Mego Int'l), its wholly owned operating subsidiary, Mego Corporation (Mego), and stockholders of Mego Int'l, in violation of 18 U.S.C. §§ 1343 and 2. Count sixteen charged Abrams with endeavoring to obstruct federal investigators in violation of 18 U.S.C. §§ 1510 and 2. Count seventeen charged all five defendants with other violations of 18 U.S.C. §§ 1510 and 2. Count eighteen charged Siegel with endeavoring to obstruct the grand jury in violation of 18 U.S.C. §§ 1503 and 2. Count nineteen charged Gold with subscribing to a false corporate income tax return in violation of 26 U.S.C. § 7206(1). Count twenty charged Abrams, Siegel, and Gold with aiding in the preparation of a false corporate income tax return in violation of 26 U.S.C. § 7206(2).

After a seven-week trial, the jury acquitted defendants Gold, Pierce, and Cotler of all charges. Abrams and Siegel were found guilty on counts one through fifteen and twenty. Abrams was also found guilty on count sixteen. Siegel was sentenced to concurrent three month terms of imprisonment on counts one through fifteen and a $5,000 fine on count twenty. Abrams received concurrent four-month prison terms on

counts one through fifteen, twenty months' probation on counts sixteen and twenty, and a $5,000 fine on counts sixteen and twenty, for a total fine of $10,000. Both defendants are free on bail pending this appeal.

During the period covered by the indictment, Mego Int'l was a publicly held international manufacturer and distributor of toys and games. Mego was one of its wholly owned subsidiaries. Abrams was chairman of the board of Mego Int'l and its president until 1980. Siegel was secretary of Mego Int'l and executive vice president of Mego.

The fraudulent scheme underlying defendants' convictions involved unrecorded cash sales of Mego merchandise which had either been closed out and marked down for clearance or returned because of damage or defect. The evidence presented at trial showed that the scheme had been furthered in various ways. Abrams conducted some cash transactions himself. Siegel also dealt in cash transactions, supervising cash sales through a retail store of imported shirts worth over $30,000. Other cash transactions were conducted with the aid of William Stuckey, who was manager of Mego's Long Island warehouse and who became a principal witness for the government. At the direction of Abrams and Siegel, Stuckey sold Mego merchandise to various street peddlers and merchants for cash. The "off the books" sales together generated in excess of $100,000 in cash.

These cash sales were not recorded on Mego's books. Rather, Stuckey gave cash customers a Mego bill of lading and a handwritten receipt. He placed his copy of the receipt and the cash inside an envelope and stored it in either an office safe or a bank safe deposit box. At intervals, as the cash accumulated, Stuckey transferred the cash to Siegel at the company's New York City office. Although initially Siegel signed the copies of the receipts Stuckey had placed in the envelope and returned them to Stuckey, he discontinued the practice in late 1975 explaining to Stuckey that he should not sign the receipts because he was an attorney.

The indictment charged that defendants used the cash for bribery and self-enrichment. The government called several witnesses who, in addition to testifying to the unrecorded cash transactions, recounted their knowledge of the uses to which the money was put. Frank Voigt, vice president and later president of Mego until he resigned in 1974, testified that defendant Abrams' father, D. David Abrams, directed him to take cash from Stuckey and from a buyer, Israel Gewirtz, and to turn the money over to Siegel. Voigt stated that on one occasion Abrams' father told him to take $100 from the cash fund and to give it to a buyer during lunch. When he attempted to get this money from Siegel, Siegel told him "it's too late. * * * Marty [Abrams] just wiped me out. He took all the cash." Voigt also testified that Walter Mandel, Mego's sales manager, told him that he thought the cash proceeds were being used for payoffs to buyers, and that Mandel had made a payoff to someone at J.L. Hudson's.

Stanford Zeisel, controller and later treasurer of Mego from 1971 to mid-1975, testified that D. David Abrams told him also that he would be receiving cash from Stuckey and that Stuckey told him the cash came from the proceeds of the sale of damaged or returned goods. Zeisel stated that Mandel once had asked him for several hundred dollars in cash, and that when Zeisel refused to give it to him, either Martin Abrams or his father told him to give Mandel the money. Mandel told him that he was going to use the money to "take care of" someone at J.L. Hudson's. On cross-examination, however, Zeisel acknowledged that he did not know what was actually done with the money. Zeisel further testified that on one occasion, while Siegel was depositing some cash proceeds in the corporate safe deposit box, he gave Zeisel $50, saying, "Marty wants us to have a Christmas gift."

Stuckey also testified concerning the cash transactions and described his method of sending the cash to either Voigt, Zeisel, or Siegel by placing it in an envelope with two

copies of the handwritten customer receipt and a copy of the bill of lading. Stuckey testified that, although Siegel would no longer sign Stuckey's handwritten receipts after late 1975, Stuckey managed to retrieve some of those receipts when he delivered the cash to Siegel. The cash sales during this period were almost exclusively to Herbert Ristau, owner of Jo Ro Sales, and, while Stuckey testified that the receipts he had for the 1975–79 period did not represent all the cash transactions, nevertheless, the receipts presented at trial showed that Stuckey took in substantial amounts of cash in these transactions, for example, more than $40,000 during 1978 alone.

In support of the government's charge that proceeds from the cash sales were used in part to bribe union officials to secure labor peace, Stuckey described his involvement in a $30,000 payment to Irving Cotler, who had promised to arrange for labor peace with the union that represented Mego's warehouse employees, in return for being given Mego's trucking business. Stuckey testified that in November 1976 Abrams told him to call Israel Gewirtz, a long time Mego customer. On the same day, Cotler called Stuckey and gave him a telephone number to call after he met with Gewirtz.

When Stuckey met Gewirtz at his office, he was taken to a nearby abandoned building and led through two locked doors and down a flight of stairs before being given the $30,000 that Gewirtz said Stuckey was "supposed to take care of for Marty Abrams". Stuckey gave the money to Cotler in a New Jersey hotel room and called Abrams to tell him that the payment had been made, saying that "the toys have been delivered". Cotler told Stuckey to forget the whole incident.

Stuckey also testified that in 1977, when Mego was afraid that it would not be able to get a shipment of containers off the docks because of a threatened strike, Frederick Pierce told him to take as much money as was necessary out of the cash sales fund and give it to Cotler "to do whatever he could do to get the goods to us". After the containers were delivered, Stuckey paid Cotler $800 out of the cash sales fund. On cross-examination, Stuckey stated that it was his belief that Pierce gave him these instructions knowing that Cotler might have to make an illegal payoff to get the goods off the pier.

Even though, as mentioned above, the cash sales were not recorded on Mego's books, Siegel and Abrams told Mego's auditors that there were no unrecorded assets. In addition, no information about the cash sales was divulged to Mego's stockholders. The jury was thus entitled to find that Siegel and Abrams, top executives in Mego, generated a secret fund of over $100,000 from cash sales of company assets without disclosing their activities to their stockholders, that they used the cash in part for private benefit, in part for illegal payments to buyers, and in part for illegal payoffs to labor unions, and that they did not account for any sum that may have remained in the fund.

In late 1978, a Mego accountant, Stephen Weingrow, discovered that the company had no system for inventorying returned merchandise, and with an associate he toured the warehouse to determine if there was any merchandise which was not recorded on Mego's books. Stuckey first called Pierce, Mego's executive vice president, and then confided to Weingrow that he had sold returned merchandise for cash and had sent the cash to Siegel. When Weingrow returned to corporate headquarters after the inspection, Michael Gold, Mego's treasurer, told Weingrow, after conferring with Abrams and Siegel, that he knew about the cash-sale scheme but that it had been stopped. He also told Weingrow not to tell Mego's controller, Harris Rosenberg, about the cash sales. Contrary to Gold's assurance that cash sales had been stopped, however, they continued until March 1979.

After Weingrow's visit and an independent visit by Rosenberg, Stuckey refused to handle any more cash sales. Thus, a sale in 1979 to Jo Ro Sales was recorded, for which Rosenberg prepared an invoice for $56,000.

When Jo Ro fell behind in its payments on the invoice, Herbert Ristau, Jo Ro's owner, refused to make further payments, claiming that he was entitled to a credit because the goods were defective. Mego's collection department retained an attorney, Stanley Goldman, to speak to Ristau. Ristau told Goldman that if he did not get a credit on the merchandise he would tell the Securities and Exchange Commission (SEC) about the cash sales. Goldman relayed this to Abrams who in turn instructed Stuckey to give Ristau a credit. This was done even though the merchandise had been purchased "as is".

After Weingrow told Gerald Bostwick, a new vice president of Mego, about the cash sales, Norman Matuozzi, Mego's director of security, was called in to investigate. In February 1980, Matuozzi arrived unannounced in Stuckey's office, and Stuckey, surprised and apprehensive, told Matuozzi that he had been making the cash sales for years and that he had delivered more than $60,000 to Siegel during the past two years. He also told Matuozzi that Abrams had told him to destroy his records of the cash sales.

Matuozzi summarized the information obtained from Stuckey in a two-page memorandum which was given to the new president of Mego Int'l, Irwin Rosenthal. Rosenthal then called in an attorney, Elkan Abramowitz, to conduct a further investigation. At the same time, he confronted Abrams with the Matuozzi memorandum. Abrams admitted to Rosenthal that he knew about the scheme but said that he had wanted it stopped.

Abrams and Siegel then removed all traces of the cash fund from Mego's safe deposit box and transferred the fund into a new box under a different name. Stuckey testified that Abrams attempted to get him to take the blame for everyone and resign, but Stuckey refused to do so. Abrams and Cotler then persuaded Stuckey to lie to Abramowitz. Stuckey told Abramowitz that the entire Matuozzi memorandum was false, and Siegel backed him up by denying the allegations in the memorandum.

After Matuozzi disclosed the scheme to government prosecutors in 1980, first Stuckey was convicted, after a separate jury trial, of nineteen counts of wire fraud, conspiracy, and obstruction of justice, and sentenced to three months in prison before the trial in this case commenced.

## DISCUSSION

Defendants raise numerous arguments on appeal. They challenge their wire fraud convictions on three grounds: (1) that there was insufficient evidence to prove violations of the wire fraud statute; (2) that admission of evidence of the $30,000 payment made to Cotler was so prejudicial that it deprived defendants of a fair trial; and (3) that introduction of the Matuozzi memorandum as evidence on the obstruction of justice charge prevented the jury from rendering a fair verdict on the wire fraud counts. In addition, Siegel argues that he was entitled to a severance from his co-defendant Abrams, because Abrams would have provided exculpatory testimony at a separate trial, and Abrams challenges his obstruction of justice conviction on the ground that the government failed to prove the existence of a criminal investigator whose investigation was obstructed.

*Sufficiency of the Evidence.*

The government charged that Abrams and Siegel engaged in a scheme to defraud Mego and Mego stockholders by violating their fiduciary duties to act honestly and faithfully in the best interest of the corporation and to account for the sale of all Mego property entrusted to them. The object of the fraudulent scheme was alleged to be the misappropriation of the cash proceeds for bribery and self-enrichment.

The wire fraud statute, 18 U.S.C. § 1343 (1976), provides:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign com-

merce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

While we have described this provision, as well as the mail fraud statute, 18 U.S.C. § 1341 (1976), which has been identically construed with respect to the issues before us, e.g., United States v. Von Barta, 635 F.2d 999, 1005 n. 11 (2d Cir.1980), cert. denied, 450 U.S. 998, 101 S.Ct. 1703, 68 L.Ed.2d 199 (1981); United States v. Louderman, 576 F.2d 1383, 1387 n. 3 (9th Cir.), cert. denied, 439 U.S. 896, 99 S.Ct. 257, 58 L.Ed.2d 243 (1978), as "seemingly limitless", United States v. Von Barta, 635 F.2d at 1001, we have also recognized that "a mere breach of fiduciary duty, standing alone, may not necessarily constitute a mail fraud", United States v. Bronston, 658 F.2d 920, 926 (2d Cir.1981), cert. denied, 456 U.S. 915, 102 S.Ct. 1769, 72 L.Ed.2d 174 (1982).

However, we have held that the statute is violated when a fiduciary fails to disclose material information "which he is under a duty to disclose to another under circumstances where the non-disclosure could or does result in harm to the other." United States v. Newman, 664 F.2d 12, 19 (2d Cir.1981) (quoting United States v. Bronston, 658 F.2d at 926); see United States v. Von Barta, 635 F.2d at 1006. While the prosecution must show that some harm or injury was contemplated by the scheme, United States v. Dixon, 536 F.2d 1388, 1399 n. 11 (2d Cir.1976), it need not show that direct, tangible economic loss resulted to the scheme's intended victims, United States v. Newman, 664 F.2d at 20; United States v. Bronston, 658 F.2d at 927; United States v. Andreadis, 366 F.2d 423, 431 (2d Cir.1966), cert. denied, 385 U.S. 1001, 87 S.Ct. 703, 17 L.Ed.2d 541 (1967). In this record there is sufficient evidence from which the jury could reasonably have concluded that defendants received the cash proceeds and used them for non-corporate purposes in breach of their fiduciary duties to act in the best interest of the corporation and to disclose material information to Mego and its stockholders.

Both defendants, as officers and employees of Mego, were linked to the unrecorded cash sales of corporate assets. With respect to Abrams, John Sclavos, a street peddler, testified that for a period of several years in the early 1970s he had purchased items from Abrams on a cash basis. The sales averaged between $300 and $1,000 per month. Sclavos testified that Abrams always put the cash in his pocket. He also testified that his partner, George Gilman, another street peddler, conducted similar transactions with Abrams. Voigt testified that on the one occasion that he attempted to obtain some cash from Siegel on the instruction of Abrams' father, Siegel told him that he had given all of the cash in the fund to Marty Abrams. Voigt testified that he had no knowledge that any of the cash sales were ever recorded.

The testimony connected Siegel even more closely to the cash proceeds. Voigt, Zeisel, and Stuckey all testified that at various points during the period covered by the indictment, they had turned the proceeds of the cash sales over to Siegel. In addition, testimony by Stuckey, Zeisel, and Rosenberg showed that oriental shirts worth between $30,000 and $35,000 were sold for cash under Siegel's supervision; however, the sales were never recorded on Mego's books.

Taken as a whole, and if believed, this testimony was sufficient for a jury to find that Siegel and Abrams participated in the cash sales. It was also sufficient to establish that they failed either to record the sales on the corporate books or to apprise the non-participating employees and stockholders of the transactions in some other fashion.

One of defendant's challenges to the sufficiency of the evidence borders on the frivolous. Abrams argues that because the sums involved were insignificant when compared with Mego's overall sales volume, there was no affirmative duty to report the cash sales to the stockholders of Mego. While he is correct that, to prove a violation of the wire fraud statute, the government

must show that the corporate officer or employee failed to disclose material information, *United States v. Newman,* 664 F.2d at 19; *United States v. Bronston,* 658 F.2d at 926; *United States v. Von Barta,* 635 F.2d at 1006–07, we cannot accept as "immaterial" a failure to disclose unrecorded cash sales exceeding $100,000 over a period of nine years. Moreover, the jury was instructed, without defense objection, that "a material fact is one which would be important to a reasonable person in deciding whether to engage in a particular transaction or to engage in certain conduct", and certainly on this record the jury could reasonably have concluded that the failure to disclose the misappropriation of more than $100,000 was a fact which would be important to a Mego stockholder or corporate officer in his decisionmaking. Thus, failure to reveal the misappropriation violated defendants' fiduciary duty to disclose material information. *See United States v. Bronston,* 658 F.2d at 928.

Defendants do not seriously contend that the wire fraud statute is not violated when a corporate officer or employee breaches his fiduciary duty to the corporation by taking the proceeds from unrecorded cash sales and using them for his own benefit. Rather, they argue that even if they did participate in the unrecorded cash sales, the record is devoid of any evidence that the money was used for other than corporate purposes and thus fails to support a finding of a breach of fiduciary duty. Defendants claim that at best the evidence merely shows that Abrams and Siegel received the proceeds from the cash sales and that Siegel periodically placed the money in the corporate safe deposit box. While neither Abrams nor Siegel testified, they argue that they received none of it for personal use and that any use of the proceeds for labor payoffs served a legitimate corporate purpose and was not in violation of any fiduciary duty.

While there is little, if any, direct evidence to show that Siegel and Abrams used the cash proceeds for other than corporate purposes, we conclude that the record as a whole does support the determination that Abrams and Siegel used the money for their own enrichment. We reach this conclusion by considering several factors.

We note first that "[t]he functions of the jury include the determination of the credibility of witnesses, the weighing of the evidence, and the drawing of justifiable inferences of fact from proven facts", *Curley v. United States,* 160 F.2d 229, 233 (D.C.Cir.), *cert. denied,* 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850 (1947), and that "the jury must use its experience with people and events in weighing the probabilities", *Holland v. United States,* 348 U.S. 121, 140, 75 S.Ct. 127, 137, 99 L.Ed. 150 (1954). Here, the jury was presented with adequate evidence from which it could have drawn a justifiable inference that defendants used the scheme for their own benefit. As discussed above, there was testimony which showed that Abrams and Siegel personally received the proceeds from the cash sales and either pocketed them or placed them in the corporate safe deposit box. Further, although the cash sales generated in excess of $100,000, the testimony concerning the use to which the money was put accounted for approximately $31,000, used mainly for illicit payoffs. The reasonable mind can think of several destinations for the more than $69,000 that was missing, and, since we have rejected the view that a jury may not rely upon an inference to support an essential allegation unless no opposite inference may be drawn from the proof, *United States v. Taylor,* 464 F.2d 240, 244 (2d Cir. 1972), we conclude that the jury could have inferred that Abrams and Siegel used some or all of the remainder of the proceeds for their own benefit, and could have fairly concluded beyond a reasonable doubt that theirs was a scheme to misappropriate the proceeds from the sale of Mego assets for self-enrichment, *see id.* at 245, by "filch[ing] from [the corporation] its valuable property", *United States v. Newman,* 664 F.2d at 19 (quoting *Abbott v. United States,* 239 F.2d 310, 314 (5th Cir.1956)).

We do not need to consider whether use of the cash for bribery on behalf of the corporation breached defendants' fiduciary

duties, for when an indictment charges acts in the conjunctive, "the verdict stands if the evidence is sufficient with respect to any one of the acts charged." *Turner v. United States,* 396 U.S. 398, 420, 90 S.Ct. 642, 654, 24 L.Ed.2d 610 (1970) (footnote omitted); *See United States v. Droms,* 566 F.2d 361, 363 (2d Cir.1977). Here, the acts were charged in the conjunctive: the jury was instructed that it could find the existence of a scheme if it found "beyond a reasonable doubt that a defendant breached fiduciary duties in furtherance of the unlawful or fraudulent purposes alleged in the indictment", namely, "bribes and self-enrichment". Thus, the jury's verdict establishes that it found beyond a reasonable doubt that the funds were misappropriated for both bribery and self-enrichment. We have determined that there is sufficient evidence in the record to support a finding of self-enrichment. As a result, defendants' convictions were valid, and inquiring into the question of whether the alleged use of the fund for illicit payoffs to labor officials violates the wire fraud statute is unnecessary. *See Turner v. United States,* 396 U.S. at 420, 90 S.Ct. at 654.

Therefore, the convictions on counts one through fifteen are affirmed.

*Evidence of $30,000 Bribe*

Defendants' next ground for reversal is that the admission of the evidence concerning Stuckey's payment, at Abrams' direction, of $30,000 to Irving Cotler in return for Cotler's promise to arrange for peaceful relations with Teamsters Local 807 was so prejudicial that they were denied a fair trial. Defendants argue that the bribery evidence, which they claim was never connected to the proceeds of the cash sales, constitutes evidence of "other crimes" and, as such, is prohibited by Fed.R.Evid. 404(b).

■ Rule 404(b) prohibits the admission of evidence of other crimes for the purpose of showing criminal character. *See, e.g., United States v. Papadakis,* 510 F.2d 287, 294 (2d Cir.), *cert. denied,* 421 U.S. 950, 95 S.Ct. 1682, 44 L.Ed.2d 104 (1975). However, such evidence may be admissible for other purposes "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed.R.Evid. 404(b). For the evidence to be admissible, it "must be relevant to an actual issue in the case", *United States v. Mohel,* 604 F.2d 748, 751 (2d Cir.1979), and the unfair prejudice to the defendant may not outweigh the probative value of the evidence, *id.; United States v. De Vaughn,* 601 F.2d 42, 45 (2d Cir.1979); Fed.R.Evid. 403. In short, while not all evidence of other crimes is proscribed, it must be examined carefully to ensure that its relevance to an issue in the case will not be outweighed by a jury's tendency to convict a defendant on the basis of his prior crimes. *See United States v. Manafzadeh,* 592 F.2d 81, 86 (2d Cir.1979).

■ The incident involving the $30,000 payment to Cotler was offered as evidence of the existence of the fraudulent scheme alleged in the indictment. Defendants, maintaining as they do that the government's evidence failed to show a connection between the bribe and the cash fund, argue that the admission of the evidence was unfairly prejudicial because, in contrast to the other evidence presented at trial of small bribes and gratuities, the $30,000 payment and its clandestine circumstances were so dramatic that they may have caused the jury to convict the defendants on the basis of the labor bribe rather than on the wire fraud scheme with which they were charged.

In weighing the probative value of the bribe evidence against its prejudicial effect, we agree with defendants that the bribe would not be relevant unless it emanated directly or indirectly from the cash proceeds. However, we take their argument further: if the bribe was connected to the secret cash fund, then the evidence was relevant to show that the fund existed, that defendants had at least one reason for accumulating the fund, and that they had knowledge of the fund, and all of these would be valid and proper grounds for admitting the bribe evidence under Fed.R. Evid. 404(b).

Examining these bases for admission, we conclude that, if the bribe came directly or indirectly from the fund, the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. We recognize that the "unfair prejudice" contemplated by Fed.R.Evid. 403 is that the jury may base its decision on an improper basis, *e.g., United States v. Benton,* 637 F.2d 1052, 1057 (5th Cir.1981); *Carter v. Hewitt,* 617 F.2d 961, 972 (3d Cir. 1980), and defendants argue that the bribe evidence was so inflammatory in comparison to the other evidence presented at trial that the jury was likely to be swayed to convict defendants on the basis of the bribe alone, whether or not it found there was a wire fraud scheme.

However, we reject this contention. The jury was presented with detailed testimony concerning defendants' participation in the receipt of proceeds from unrecorded cash sales, and the bribe evidence was offered, in part, as further proof of the existence of the cash fund. Of course, if the jury believed that the bribe money came from the fund, the evidence was damaging to defendants' case; this, however, is not the type of unfair prejudice against which defendants are protected by Fed.R.Evid. 403, *United States v. DeLillo,* 620 F.2d 939, 946 (2d Cir.), *cert. denied,* 449 U.S. 835, 101 S.Ct. 108, 66 L.Ed.2d 41 (1980).

The relationship between the $30,000 bribe and the secret cash fund was a question of fact, and the jury was specifically instructed that if it did not find that "a particular payment was made from the alleged fund, then [it could] not consider that payment in connection with the wire fraud counts." Thus, our inquiry on this issue focuses on the sufficiency of the evidence linking the bribe to the cash fund.

That evidence, although certainly not overwhelming even when viewed in the light most favorable to the government, *United States v. Ruffin,* 575 F.2d 346, 354 (2d Cir.1978), was nevertheless sufficient for a jury to conclude that the $30,000 came from the secret cash fund. Voigt testified that Gewirtz was a regular cash customer

of Mego, and that on several occasions he had received cash payments from Gewirtz, payments which Voigt passed on to Siegel and which were never recorded on the company books. From this testimony, a juror could infer that the proceeds from Gewirtz' purchases frequently swelled the secret coffers.

On the bribe transaction itself Stuckey testified that in October 1976 Cotler told him that he would like to handle some of Mego's trucking business and that he had had experience dealing with Local 807, the union with which Mego was having difficulty in negotiations. The next day, Cotler met with Abrams, and, shortly thereafter, Abrams instructed Stuckey to meet with Gewirtz. When Stuckey went to Gewirtz' office, Gewirtz led him to an abandoned building, through two locked doors, and down a flight of stairs before handing him the $30,000 cash in two envelopes. Stuckey then proceeded to New Jersey where he handed the $30,000 over to Cotler.

Despite the fact that on cross-examination Stuckey testified that Gewirtz had told him that the $30,000 was a loan to Mego, the jury could have concluded from the testimony of Stuckey and Voigt that the $30,000 was an indirect payment from the cash fund, either as money paid by Gewirtz for merchandise he had already received, or paid on account for merchandise he expected to receive in the future. The jury was entitled to believe that Gewirtz' statement to Stuckey that the money was a loan was made to hide his participation in an illicit transaction.

Since the jury could have fairly concluded beyond a reasonable doubt that the $30,000 cash payment to Cotler came from the secret cash fund, we conclude that the evidence was properly admitted.

*The Matuozzi Memorandum.*

The Matuozzi memorandum is a two-page document written by Norman Matuozzi, Mego's Director of Security, to Anthony Carlino, Mego's Vice-President for Administration, that describes Matuozzi's visit to Stuckey at the warehouse in February 1980. In the memo, Matuozzi stated

that Stuckey described the cash sales to Herbert Ristau of Jo Ro Sales and implicated both Abrams and Siegel. In addition, according to the memo, Stuckey told Matuozzi that sometime in early 1979 Abrams told Stuckey to destroy all his records of the cash sales. Stuckey repeatedly stated, "I'm not going to hold the bag for them." The memo concludes with Matuozzi's observation that "if these allegations are true we also might have some federal laws violated."

The memorandum was introduced as evidence on count seventeen, which charged all of the defendants with preventing the special counsel retained by two of Mego's officers from communicating the information contained in the memo to federal investigators in violation of 18 U.S.C. § 1510. The district court denied defendants' pretrial motion to exclude the evidence on hearsay grounds, finding that the memorandum would be admissible for non-hearsay purposes on count seventeen, e.g., to show the existence of information relating to a federal crime, to show that Mego's special counsel possessed information relating to the violation, to demonstrate that defendants knew special counsel had such information and that he would go to federal investigators, and to provide a background for testimony concerning defendants' alleged misrepresentations to special counsel. At trial, defendants again voiced their objections to admission of the memo but acquiesced in the following limiting instruction:

> [The] memorandum has been received in evidence, as you know, but it may be considered * * * only for certain limited purposes. * * * [I]t's been received to show that Mr. Stuckey made certain statements which led to an investigation, but it's not received to show the truth, to show that the statements reported were true or that the things said in the memorandum were true. In other words, you are to consider it only as a document which contains various words written on the document, but it is not in evidence that the words written in there are true. It is evidence only that this piece of paper with the words that appear on the paper

was presented to Mr. Abramowitz in connection with his assignment.

The jury was also instructed that the memo could only be considered in connection with the obstruction of justice counts and not on the wire fraud counts.

Defendants argue on appeal, as they maintained throughout the proceedings below, that admission of the memo was reversible error because no cautionary instruction could prevent the jury from considering the memo for the truth of the matters asserted therein, a description of the crimes charged in counts one through fifteen. The government contends that there is no basis for concluding that the jury could not follow the limiting instruction.

Limiting instructions are "an accepted part of our present trial system", *United States v. Figueroa,* 618 F.2d 934, 943 (2d Cir.1980), and we have found on numerous occasions that an instruction was sufficient to enable the jury to limit its consideration of the evidence to the purpose for which it was offered, e.g., *United States v. Reed,* 639 F.2d 896, 907 (2d Cir.1981); *United States v. Rosenwasser,* 550 F.2d 806, 809 (2d Cir.), *cert. denied,* 434 U.S. 825, 98 S.Ct. 73, 54 L.Ed.2d 83 (1977). Although we have recognized that "there are limits upon the powers of jurors—or judges or anyone—to keep interconnected thoughts separated from each other," *United States v. Kaplan,* 510 F.2d 606, 611 (2d Cir.1974), we believe that the cautionary instruction in this case was adequate to enable the jury to limit its consideration of the memo to the purpose for which it was offered.

The jury was instructed that the memo was to be considered not for its contents but solely for the fact that it existed, that it prompted an investigation, and that it had been given to Elkan Abramowitz, special counsel for Mego. We reject defendants' argument that the memo was relevant only if the jury considered the truth of its contents; rather, the memo was relevant on count seventeen as evidence tending to show that defendants knew that an investi-

gation was in progress because of the memo and that they took steps to prevent special counsel from going to federal authorities, charges of which all defendants were acquitted. We believe that the jury should have had no difficulty in following the district judge's direction and limiting its consideration of the memo to the purposes for which it was offered on count seventeen.

Defendants' central claim about the memo is that its introduction on count seventeen unfairly prejudiced the jury in its deliberations on counts one through fifteen because the memo contained a summary of Stuckey's testimony at trial. They argue that the jury was presented with a neat precis of Stuckey's confession to the wire fraud charges and that it is unlikely that a juror, regardless of the limiting instruction given, could have avoided considering the contents of the memo as substantive evidence on counts one through fifteen, an impermissible hearsay use.

Having determined that the evidence was relevant on count seventeen and that the limiting instruction adequately directed the jury to consider it only for the non-hearsay purposes discussed above, we conclude that there was little, if any, danger that the jury was prejudiced by the memo in its deliberations on counts one through fifteen. First, this is not a case where a limiting instruction was inadequate "because the 'authorized' use of the evidence shaded so closely and uncontrollably into the forbidden", *United States v. Kaplan,* 510 F.2d at 611. The memo was to be considered solely for the fact that it prompted an investigation which defendants allegedly attempted to contain within the corporation, and the jury could consider the memo for this purpose without considering its contents. In addition, the jury was instructed to consider the memo only in connection with the obstruction of justice counts and not in connection with counts one through fifteen, an instruction which made it clear to the jury that the memo was not to be considered in connection with its deliberations on the wire fraud counts.

Finally, there is the nature of the memo itself. We have observed that "[t]he more official and authoritative a writing appears to be, the less likely it is that even cautious or cynical individuals will be able to resist the temptation to regard the accuracy of the contents of the document as being beyond reproach." *United States v. Quinto,* 582 F.2d 224, 235 (2d Cir.1978). In *Quinto,* where we considered whether an erroneously admitted report was likely to have improperly influenced the jury, the evidence at issue was an "eight-page single spaced IRS report". We concluded that, in view of the impressive nature of the document, it was likely that the jury did consider and rely upon the contents of the report in its deliberations. *Id.*

In contrast, the Matuozzi memo is just that—a memo, *i.e.,* a two-page typed informal summary of Matuozzi's conversation with Stuckey and his observation that some federal laws might be violated. In view of the large number of papers in the form of receipts and memos admitted into evidence at trial, it is more than likely that the jury did not place undue emphasis on the memo.

We are convinced that the jury was able to follow the limiting instructions and to consider the memo only for the purposes for which it was offered and only on the obstruction of justice counts. There is a "presumption that juries will follow instructions," *Watkins v. Sowders,* 449 U.S. 341, 347, 101 S.Ct. 654, 658, 66 L.Ed.2d 549 (1981), and we see no reason to disregard that presumption in this case. We conclude that the district judge acted well within his discretion in admitting the Matuozzi memo.

*Abrams' Conviction Under 18 U.S.C. § 1510.*

 Abrams was convicted on count sixteen of preventing the communication of information to a criminal investigator in violation of 18 U.S.C. § 1510, which provides

(a) Whoever willfully endeavors by means of bribery, misrepresentation, intimidation, or force or threats thereof to obstruct, delay, or prevent the communication of information relating to a viola-

tion of any criminal statute of the United States by any person to a criminal investigator * * *

 * * * * * *

Shall be fined not more than $5,000, or imprisoned not more than five years, or both.

(b) As used in this section, the term "criminal investigator" means any individual duly authorized by a department, agency, or armed force of the United States to conduct or engage in investigations of or prosecutions for violations of the criminal laws of the United States.

18 U.S.C. § 1510 (1976) (current version at 18 U.S.C.A. § 1510 West Supp.1982). The specific charge was that, in response to a threat by Ristau of Jo Ro Sales to go to the SEC with his information concerning the cash sale transactions, Abrams reduced Ristau's bill by $15,000. At the time this incident occurred, no federal or SEC investigation of defendants' activities was taking place.

Abrams argues that this conviction should be reversed because § 1510 requires the existence of a criminal investigator whose investigation is being obstructed. The government's position, accepted by the court below, *United States v. Abrams*, 543 F.Supp. 1184, 1187–88 (S.D.N.Y.1982), is that it need not prove either that a federal criminal investigation was actually taking place, or the existence of an actual criminal investigator, but merely must show that the defendant had a reasonably founded belief that information had been or was about to be given.

The language of the statute itself does not yield a clue as to whether the government need prove the existence of a particular criminal investigator to whom the information is about to be communicated or that an ongoing investigation is taking place. The brief house report on the bill notes that the statute was designed to "plug a loophole" in 18 U.S.C. §§ 1503 and 1505 which prohibited injuries to witnesses and informants once judicial proceedings or legislative inquiries had commenced, H.R.Rep. 658, 90th Cong., 1st Sess. 2, *reprinted in*

1967 U.S.Code Cong. & Ad.News 1760, 1761 (House Report). However, the report does not indicate at what point the protections of § 1510 are triggered, other than to state that the purpose of the statute was to ensure that "[t]he Federal Government [could] provide the same protection and assurance to a witness or informant willing to go to the FBI or other Federal agency that it can at a later stage in the prosecution." *Id.*

We have not previously addressed the issue of whether § 1510 requires the existence of a criminal investigator and/or an ongoing criminal investigation. Other circuits that have upheld convictions under § 1510 have not faced this issue directly, because in each case the defendants had actual knowledge of an investigation taking place, *e.g., United States v. Thetford*, 676 F.2d 170 (5th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 790, 74 L.Ed.2d 996 (1983); *United States v. Lippman*, 492 F.2d 314 (6th Cir.1974), *cert. denied,* 419 U.S. 1107, 95 S.Ct. 779, 42 L.Ed.2d 803 (1975); *United States v. Kozak*, 438 F.2d 1062 (3d Cir.), *cert. denied,* 402 U.S. 996, 91 S.Ct. 2180, 29 L.Ed.2d 162 (1971).

Nor have cases overturning § 1510 convictions dealt directly with the question that confronts us here. In *United States v. Williams*, 470 F.2d 1339 (8th Cir.), *cert. denied,* 411 U.S. 936, 93 S.Ct. 1912, 36 L.Ed.2d 396 (1973), the conviction was reversed not because of the lack of a federal criminal investigator or an investigation in progress, but because there was no evidence that the defendant knew that the person he struck with a rifle was a federal informant. *Id.* at 1341–42. Similarly, in *United States v. Grande*, 620 F.2d 1026 (4th Cir.), *cert. denied,* 449 U.S. 919, 101 S.Ct. 317, 66 L.Ed.2d 146 (1980), the conviction was overturned because there was insufficient evidence to show that the defendant knew that the person he threatened was providing information to federal investigators. *Id.* at 1037. And in *United States v. Cameron*, 460 F.2d 1394 (5th Cir.1972), the court stated that § 1510 required the existence of "a criminal investigator * * * who is conducting an investigation of the violation of a

criminal statute", *id.* at 1401, but did not reverse on that ground since an investigation was in progress. Rather, the court overturned the conviction because it found that the statute was not intended to apply to communications between alleged accomplices. *Id.* Finally, in *United States v. Zemek,* 634 F.2d 1159 (9th Cir.1980), *cert. denied,* 450 U.S. 916, 101 S.Ct. 1359, 67 L.Ed.2d 341 (1981), although the court stated that "[s]ection 1510 does not require 'an investigation be taking place' concurrently with the proscribed acts", 634 F.2d at 1176–77 (quoting *United States v. Lippman,* 492 F.2d at 317), there had been an investigation which had concluded prior to the acts and threats of violence alleged in the indictment, and the defendants had reason to believe that further information was or was about to be given to those same investigators. *Id.* at 1176.

Abrams' case stands in a different light from any of these. No federal criminal investigation was being conducted, nor was one contemplated; consequently, there was no specific federal criminal investigator to whom information could have been communicated. And the sole basis for finding that Abrams had knowledge or a reasonable belief that information was about to be communicated in any fashion lay in a remark by Ristau that "if I don't get a credit, I'm going to the SEC to find out what happened to the $80,000" (the amount of merchandise he had bought for cash). There are limits to stretching statutory language, and to describe Abrams' action here as "willfully endeavor[ing] * * * [to] prevent the communication of information relating to a violation of any criminal statute of the United States * * * to a criminal investigator" exceeds those limits.

Section 1510 was intended to "protect informants and witnesses against intimidation or injury by third parties with the purpose of preventing or discouraging the informants or witnesses from supplying or communicating information to the Federal investigator." House Report at 3, *reprinted in* 1967 U.S.Code Cong. & Ad.News at 1762. We hesitate to interpret it in a manner that would encourage blackmailers. Examining both the congressional purpose as embodied in the statute's scant legislative history, as well as the language of the statute itself, we conclude that under the circumstances here § 1510 does not encompass Abrams' capitulation to Ristau's demand.

Lest our decision on this issue be interpreted too broadly, we emphasize what we are not deciding: we do not hold that § 1510 requires the existence of an actual criminal investigator or that an ongoing criminal investigation be in progress; nor do we hold that § 1510 can never be violated when the harassment or bribery is carried out in response to a threat to go to a federal investigative authority. These questions we leave for another day.

We hold only that where there was no federal investigation either being conducted or contemplated, where there was no particular federal criminal investigator about to receive information, where the payment was solicited by the "informant", and where the defendant's sole knowledge of the possibility of the *communication of information* to federal authorities was derived from a threat by a customer that if he did not get a credit on goods purchased he would go to the SEC, § 1510 was not violated. Accordingly, we reverse Abrams' conviction on count sixteen.

*Severance.*

█ Siegel's final argument is that the district court's denial of his motion to sever his trial from that of Abrams deprived him of a fair trial. Siegel claims that he was entitled to a severance because Abrams stated on the record that, after his own trial proceedings had been completed, he would testify at a separate trial of Siegel that all of the money Siegel received from 1972 through 1975 was given to Abrams and used for corporate purposes. Siegel's motion to sever was made after the government had rested its case.

Our sole inquiry on this issue is whether the trial court's denial of the motion to sever was an abuse of discretion. *Opper v. United States,* 348 U.S. 84, 95, 75 S.Ct. 158, 165, 99 L.Ed. 101 (1954); *United States v.*

*Finkelstein,* 526 F.2d 517, 523 (2d Cir.1975), *cert. denied,* 425 U.S. 960, 96 S.Ct. 1742, 48 L.Ed.2d 205 (1976); *United States v. Turcotte,* 515 F.2d 145, 150 (2d Cir.), *cert. denied,* 423 U.S. 1032, 96 S.Ct. 564, 46 L.Ed.2d 406 (1975). We have previously identified some of the criteria a trial court should consider in determining whether to sever the trial of a defendant who claims that a co-defendant will offer exculpatory evidence. They are: "(1) the sufficiency of the showing that the co-defendant would testify at a severed trial and waive his Fifth Amendment privilege; (2) the degree to which the exculpatory testimony would be cumulative; (3) the counter arguments of judicial economy; and (4) the likelihood that the testimony would be subject to substantial, damaging impeachment." *United States v. Finkelstein,* 526 F.2d at 523–24 (citations omitted); *accord United States v. Taylor,* 562 F.2d 1345, 1362 (2d Cir.), *cert. denied,* 432 U.S. 909, 97 S.Ct. 2958, 53 L.Ed.2d 1083 (1977). After weighing these factors in this case, we conclude that the trial judge did not abuse his discretion in denying Siegel's motion.

We note first that the record does not sufficiently demonstrate that Abrams would have been willing to waive his fifth amendment privilege and testify at a separate trial. The sole evidence in the record on this issue is Siegel's counsel's statement that Abrams would testify at a separate trial that he had received the money and used it for corporate purposes, followed by Abrams' unsworn answer in the affirmative to his own attorney's question, "Would you testify in accordance with what [Siegel's attorney] stated?" Abrams made no representation on the record that he would be willing to waive his fifth amendment privilege to testify at a separate trial.

Moreover, the testimony Abrams allegedly would have given would have been cumulative in the sense that it would have been a repetition of the testimony of Voigt and Zeisel. Both testified that the cash proceeds went to Abrams, and the only additional fact in Abrams' proffered testimony was that all of the proceeds were used for corporate purposes. In addition, in view of much. of the other testimony at trial—*e.g.,* the secretive manner in which the cash proceeds were handled; the clandestine circumstances surrounding the $30,-000 payoff; and Abrams' instructions that Stuckey and Ristau should destroy all their records—we conclude that there was a substantial likelihood of impeachment of Abrams' testimony in any future trial.

Finally, considerations of judicial economy weigh heavily in the government's favor here. While the fact that it is usually more efficient to try two defendants charged with the same crime together rather than separately does not always outweigh a defendant's interest in severance, *see United States v. Finkelstein,* 526 F.2d at 524, we must conclude that the public interest in conserving judicial resources is increased, and the defendant's interest lessened, where the defendant does not move to sever until after the government has rested its case and the trial is almost over, as happened here.

Thus, Siegel's failure to make a sufficient showing that Abrams would waive his fifth amendment privilege and testify at a separate trial, coupled with (1) the cumulative nature of Abrams' proposed testimony, (2) the likelihood that it would have been subject to substantial impeachment, and (3) the burdens placed on the judicial system because the motion to sever was not made until near the end of trial together provide ample support for the district court's discretionary refusal to sever Siegel's trial.

## CONCLUSION

In affirming defendants' convictions on the wire fraud counts, we in no way wish to encourage the type of indictment prosecuted here. Twenty counts were brought against five defendants, all but two of whom were acquitted of all charges. Siegel and Abrams, although convicted of the wire fraud charges (which might more properly have been redressed in a shareholder's derivative suit or in a state criminal prosecution), were acquitted on several other counts. In addition, we have found that

the proof on count sixteen was legally insufficient to show a violation of 18 U.S.C. § 1510. While we applaud the government's concentration on unrecorded cash sales, a particularly common form of criminal activity, we nevertheless urge the government to think carefully before instituting other massive prosecutions having such slender foundations as this one.

Defendants' convictions on counts one through fifteen are affirmed. Abrams' conviction on count sixteen is reversed.

WINTER, Circuit Judge, dissenting in part and concurring in part:

Once again sailing against the wind in mail or wire fraud cases (or so they are called), I dissent.

In *United States v. Margiotta,* 688 F.2d 108 (2d Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983), we read the mail fraud statute to create a regulatory code subjecting public officials, candidates and party leaders to criminal prosecution for allegedly deceptive political speech. Today we read the wire fraud statute to create a federal law of fiduciary obligations imposed on corporate directors and officers, thereby setting the stage for the development of an expandable body of criminal law regulating intracorporate affairs.

The majority's legal theory is that wire fraud occurred because some of Mego's funds were diverted "for noncorporate purposes in breach of [the defendants'] fiduciary duties to act in the best interest of the corporation and to disclose material information to Mego and its stockholders." The evidence is that Mego, a corporation with sales ranging between $30 million and $109 million, during the relevant period, had off-book transactions engineered by the defendants averaging slightly over $11,000 per year. There is no evidence—*none*—that any of the money was diverted to the personal use of either Siegel or Abrams. The government's *prima facie* case is thus made out solely by a showing of improper corporate record keeping.

I

State corporate laws universally impose upon corporate directors and officers certain obligations labelled fiduciary duties which are implied from the corporate relationship. These duties are of a contractual nature. However, because of the high transaction costs of organizing numerous parties and the difficulty of spelling out precise rules to govern future transactions, fiduciary obligations are developed and applied on a case by case basis by state courts. Easterbrook & Fischel, *Corporate Control Transactions,* 91 Yale L.J. 698, 700–702 (1982).

There is nothing in the language or legislative history of the wire fraud statute remotely suggesting that it was intended as a vehicle for the enforcement of fiduciary duties imposed upon corporate directors or officers by state law. To allow it to be so used would thus be a grave error. However, what the majority does is infinitely worse, for it holds that the wire fraud statute creates a *federal* law of fiduciary obligations. There is no pretense that the source of the fiduciary duty at issue in this case was anything but federal law. There is no reference in the majority opinion to state law or even to Mego's state of incorporation. The jury simply was told that it was up to it to decide whether, as part of the obligation "to act in the best interest of the corporation," the defendants were under a duty to disclose the off-book transactions to shareholders.

The creation of this federal fiduciary duty is no minor step. The relationship of federal and state law in the governance of corporations is a matter of great debate, *see generally An In-Depth Analysis of the Federal and State Roles in Regulating Corporate Management,* 31 Bus.Law. 863–1213 (1976); Fischel, *The Corporate Governance Movement,* 35 Vand.L.Rev. 1259 (1982); *Corporate Rights and Responsibilities: Hearings Before the Comm. on Commerce United States Senate,* 94th Cong., 2d Sess. (1976), in which the proponents of federal regulation have strenuously argued that state law governing the conduct of corpo-

rate directors and officers is too lax. *E.g.,* Cary, *Federalism and Corporate Law: Reflections upon Delaware,* 83 Yale L.J. 663 (1974). Over the years, Congress has responded by mandating disclosure through the various securities laws, 15 U.S.C. §§ 77a–78kk (1976), but has generally declined to enact substantive regulation of corporate transactions. *See generally Santa Fe Industries v. Green,* 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977).

Notwithstanding the lack of even a hint of relevant Congressional intent in enacting the wire fraud laws, notwithstanding Congress' repeated rejection of pleas to strengthen the fiduciary obligations imposed on corporate directors and officers by state law, and notwithstanding the existence of precise federal legislation requiring disclosure of particular corporate matters, we read the wire fraud statute to embody a federal law of fiduciary obligations, including an undefined duty of yet further disclosure, enforceable by the sanctions of the criminal law. *Compare United States v. Chiarella,* 588 F.2d 1358 (2d Cir.1978), *rev'd,* 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980).

It will be up to later juries and later panels to define what actions by corporate directors and officers are or are not "in the best interest of the corporation." The elasticity of the concept and the potential for infinite expansion, however, are foreshadowed by the facts of the present case. The "material" information not disclosed to shareholders in the instant case is a series of transactions of roughly $11,000 annually over nine years, a wholly trivial sum in light of Mego's sales. In holding that these transactions "would be important to a Mego stockholder," the majority simply closes its eyes to investment realities, for there is not a shred of evidence that such a sum would affect share price in the slightest. It requires little imagination to foresee future application of the theory of this case to the use of corporate airplanes, the size of executive salaries, expense accounts, etc.

Moreover, there is no evidence—again, *none*—that the transactions in question harmed the corporation. By allowing an inference of diversion to personal use to be drawn solely from the lack of proper records, the majority has in effect dropped the element of a scheme to defraud from the offense. Courts long ago eliminated the need to show a substantial connection between the scheme to defraud and the use of the mails or wires. Now we are eliminating the need to show fraud. In effect, a new crime—corporate improprieties—which entails neither fraud nor even a victim, has been created.

II

Other aspects of the majority decision also trouble me. Adequate notice to those affected by such elastic concepts is simply not possible, for even the wisest counsel cannot foresee what corporate acts may after the fact attract a prosecutor's suspicion (or ire) and a judicial stamp of impropriety. The key act of the defendants here was the arousal of prosecutorial suspicions. The government's argument brims with innuendo of other crimes: embezzlement, bribery of a union official, commercial bribery, tax evasion, and securities law violations, all of which go to prove only that the criminal charges in issue are a surrogate for ones which the prosecutor lacked either evidence or jurisdiction to make. The overtones of the majority opinion suggest that the defendants here have been convicted essentially of stealing or embezzling funds from Mego. Had those been the crimes actually charged, however, verdicts would likely have been directed in their favor, for there is no evidence that the cash in question was diverted to any purpose other than increasing the profits of the corporation.

Finally, as in *Margiotta,* a crime is created which by its nature will be prosecuted infrequently and in a highly selective manner. If judges perceive a need for a catchall federal common law crime, the issue should be addressed explicitly with some recognition of the dangers, rather than continue an inexorable expansion of the mail and wire fraud statutes under the pretense of merely discharging Congress' will.

Quite apart from the self-evident danger in creating vast areas of discretion for prosecutors to single out individuals for improper reasons, there is a real question as to whether the costs in resources equal the benefits achieved. The trial here, involving five defendants, each with his own counsel, lasted seven weeks, consuming substantial prosecutorial, private and judicial resources. Only two of the five defendants were convicted, and total jail sentences amounted to only seven months. In truth, the law enforcement results from society's point of view are as trivial as the off-book transactions were to Mego. Even had the government been more successful, however, there is reason to doubt that much would have been gained. Ill-defined crimes which are necessarily prosecuted on an infrequent and selective basis probably have little deterrent value. Were we to restrict the mail and wire fraud statutes to swindling and fraud, as originally intended, rather than extend them to perceived political or corporate improprieties, we would not only perform the judicial function correctly but probably also make a sensible policy judgment in terms of costs and benefits.

### III

I concur in the reversal of Abrams' conviction on count sixteen.